MANUFACTURERS' LIGHT & HEAT CO. v. OTT et al., Public Service Commission of West Virginia.

(District Court, N. D. West Virginia. July 29, 1914.)

1. CONSTITUTIONAL LAW (§§ 62, 80*)—CORPORATIONS (§ 394*)—EXECUTIVE BOARDS—CONSTITUTIONALITY OF STATUTE CREATING.

Act W. Va. Feb. 22, 1913 (Laws 1913, c. 9), creating a state Public Service Commission and prescribing its powers, is not invalid as conferring on such Commission legislative, executive, and judicial powers in violation of the state Constitution, but merely creates an agency for carrying out the legislative scheme with respect to public service corporations.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94–102, 140, 143–147; Dec. Dig. §§ 62, 80;* Corporations, Cent. Dig. § 1576; Dec. Dig. § 394.*]

2. COURTS (§ 489*)—JURISDICTION OF FEDERAL COURTS—STATUTE GIVING REMEDY IN STATE COURT.

One entitled to invoke the jurisdiction of a federal court on the ground that a state statute deprives him of property rights in violation of the Constitution of the United States cannot be deprived of that right by reason of being given a remedy in the state courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1324–1330, 1333–1341, 1372–1374; Dec. Dig. § 489.*]

3. GAS (§ 2*)—REGULATION—STATUTES—"GAS COMPANY."

The term "gas companies" as used in Act W. Va. Feb. 22, 1913 (Laws 1913, c. 9), relating to public service corporations, includes companies furnishing natural gas.

[Ed. Note.—For other cases, see Gas, Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 4, p. 3045.]

4. CONSTITUTIONAL LAW (§ 38*)—VALIDITY OF STATUTE.

A statute is invalid that requires something to be done which is forbidden by the Constitution, but it is not essential to the validity of a statute that it should enjoin obedience to the Constitution, or re-enact its provisions.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 36; Dec. Dig. § 38.*]

5. CONSTITUTIONAL LAW (§ 318*)—DUE PROCESS OF LAW—STATUTE CREATING PUBLIC SERVICE COMMISSION.

Act W Va. Feb. 22, 1913 (Laws 1913, c. 9), relating to public service corporations and creating a Public Service Commission, is not subject to the objection that it authorizes the Commission to take property without due process of law, in that it makes no provision for notice and hearing

---

before the fixing of rates; that being a requirement of the state Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 949; Dec. Dig. § 318.*]

**6. COMMERCE (§ 60*)—STATE REGULATION OF NATURAL GAS COMPANIES—CONSTITUTIONALITY.**

A state regulation, fixing the price to be charged by gas companies for natural gas furnished to consumers within the state, is not an unlawful regulation of interstate commerce, although some of the gas supplied is piped from other states; Congress having taken no action affecting the subject.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 91–95; Dec. Dig. § 60.*]

**7. GAS (§ 14*)—STATE REGULATION OF RATES—WEST VIRGINIA STATUTE.**

Under Act W. Va. Feb. 22, 1913 (Laws 1913, c. 9), creating a Public Service Commission, such Commission has power on its own motion to institute an inquiry into the reasonableness of gas rates, and on a finding that those charged are unreasonable, to fix reasonable rates.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

**8. CONSTITUTIONAL LAW (§ 318*)—STATE REGULATION OF RATES—LEGALITY OF PROCEEDINGS.**

Gas companies *held* not denied due process of law on a hearing before the Public Service Commission of West Virginia as to the reasonableness of gas rates because of the expression of a request by one of the commissioners that the leading counsel for the companies should withdraw, made after charges against the fairness and integrity of the Commission had been made but not substantiated, and because of the closing of the hearing after counsel without justification had withdrawn and refused to further appear.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 949; Dec. Dig. § 318.*]

**9. GAS (§ 14*)—STATE REGULATION OF RATES—REVIEW BY THE COURTS.**

In a suit to enjoin the enforcement of gas rates fixed by a state commission after a hearing, the court cannot consider ex parte affidavits to supply the place of evidence which complainants had the opportunity to produce before the commission, but did not. and on such affidavits set aside the findings of the commission. Nor can it set aside such findings where on the evidence there is ground for difference of opinion among reasonable men.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

**10. GAS (§ 14*)—STATE REGULATION OF RATES—VALIDITY OF RATES.**

A rate fixed for natural gas by a state commission cannot be held confiscatory because it would require the companies affected, under contracts made by them, to supply gas to consumers in other states at a loss.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

**11. GAS (§ 14*)—STATE REGULATION OF RATES—SUIT TO ENJOIN ENFORCEMENT OF RATES.**

In a suit in a federal court to enjoin the enforcement of gas rates fixed by a state commission, the complainant assumes the burden of showing with reasonable certainty the invasion of rights affirmed or conferred by the Constitution or laws of the United States, as the court cannot set up views it might have reached as to what ought to be done against the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

conclusions of the Commission, which have a reasonable basis of support in the evidence.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

In Equity. Suit by the Manufacturers' Light & Heat Company, the Manufacturers' Gas Company, the Tri-State Gas Company, the Wheel-ing Natural Gas Company, the Ohio Valley Gas Company, the Blacksville Oil & Gas Company, the Cameron Gas and Oil Company, the Wetzel Gas Company, and the New Cumberland Water & Gas Company against Lee Ott, Howard N. Ogden, Charles H. Bronson, and Wade C. Kilmer, composing the Public Service Commission of the State of West Virginia. On motion for preliminary injunction. Motion denied.

A. Leo Weil, of Pittsburg, Pa., Geo. E. Price, of Charleston, W. Va., B. M. Ambler, of Parkersburg, W. Va., and Charles McCamic, of Wheeling W. Va., for plaintiff.

A. A. Lilly, Atty. Gen., of Charleston, W. Va., and Frank W. Nesbitt and J. B. Sommerville, both of Wheeling, W. Va., for defendant.

Before PRITCHARD and WOODS, Circuit Judges, and DAYTON, District Judge.

WOODS, Circuit Judge. The Public Service Commission of West Virginia made an order on April 22, 1914, setting forth the finding of unjust, unreasonable, and excessive rates charged consumers of natural gas in the state of West Virginia by Manufacturers' Gas Company, Tri-State Gas Company, Wheeling Natural Gas Company, Ohio Valley Gas Company, Blacksville Oil & Gas Company, Cameron Gas & Oil Company, Wetzel Gas Company, and New Cumberland Water & Gas Company, and declaring and prescribing as reasonable and just rates ranging from 11 to 25 cents per thousand cubic feet, according to the class of service and the Commission's view of the situation of the company. Thereafter the Manufacturers' Light & Heat Company, a Pennsylvania corporation, and the West Virginia corporations above named brought this suit to enjoin the Commission from putting the prescribed rates into effect. The bill asserts the right of the Pennsylvania corporation to be heard on the ground that it has acquired all of the stock of the West Virginia corporations and is operating all their pipe lines and other property as a unit. A temporary restraining order was granted by Hon. Alston G. Dayton, District Judge, and the application for a temporary injunction was heard and is now to be passed on by three judges, as required by the statute. The numerous grounds upon which the injunction is asked will be considered in what seems to be their logical sequence.

[1] 1. The statute creating the Public Service Commission and prescribing its powers and duties enacted February 20, 1913, is attacked on the ground that it confers legislative, executive, and judicial powers and unites the three forms of power in one Commission, contrary to the Constitution of the state. Detailed analysis of the statute is not

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

required to show that it is in no essential particular unlike the numerous similar statutes which have been sustained by the courts. It confers the power to investigate and ascertain if the public service corporations of the kind named in it are charging reasonable rates, as a means of fixing reasonable rates for the future; but no judicial power is conferred to adjudge damages or other relief for making unreasonable charges or for other violations of law. The provision for appeal from the orders of the Commission to the Supreme Court of the state does not connote judicial power in the Commission. The point is decided by the Supreme Court of the state in United Fuel Co. v. Public Service Commission (W. Va.) 80 S. E. 931, holding that the appeal provided only meant to enlarge somewhat the power before exercised under the writs of mandamus and prohibition; that under it the court could not review any act of the Commission falling within the scope of its power; that the court's action must be judicial in holding the Commission within its sphere as prescribed by the statute and limited by the statute, the Constitution of the state, and the Constitution of the United States, as distinguished from the limited administrative power of the Commission. The powers of the Commission have no feature of the executive branch of the government, for it controls no power nor machinery for the enforcement of its orders. The Legislature of the state has not delegated its legislative power, but merely provided an agency for carrying out the legislative scheme with respect to public service corporations. The statute falls within the distinction thus stated by Justice Day in Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 32 Sup. Ct. 436, 56 L. Ed. 729, and applied in many other cases:

"The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress."

[2] 2. Tangent to this point is the objection made by the Commission, relying on Prentis v. Atlantic Coast Line R. R., 211 U. S. 210, 29 Sup. Ct. 67, 56 L. Ed. 150, that this court should not entertain the bill until the complainants have sought relief by the appeal to the Supreme Court of the state provided by the statute. At least two questions under the federal Constitution are made by the pleadings, whether the rates prescribed are confiscatory, and whether the complainant's property is about to be taken without due process of law. In the case last cited the court restated the principle laid down in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, and other cases that the sufficiency of rates with reference to the federal Constitution is a judicial question over which federal courts have jurisdiction by reason of its federal nature, and that one entitled to sue in the federal courts cannot be deprived of that right by reason of being allowed a remedy in the state court. True, in the Prentis Case it was held that the complainants must carry their grievance to the Supreme Court of Appeals of West Virginia for review before invoking the equity jurisdiction of

the federal courts; but this was on the distinguishing ground that under the Virginia Constitution and statute the proceedings by which the matter was to be carried to the Supreme Court were legislative in character, and that the court in reviewing the action of the Commission was performing an extrajudicial function. The distinction is clearly drawn by the Supreme Court of West Virginia in United Fuel Co. v. Public Service Commission, supra, and by the Supreme Court of the United States in Bacon v. Rutland R. R., 232 U. S. 134, 34 Sup. Ct. 283, 58 L. Ed. 538.

[3] 3. The contention that the term "gas companies" used in the statute was not intended to embrace companies furnishing natural gas has no foundation. The statute was enacted in view of the fact that a very large part of the gas consumed in the state was natural gas. But even if there were ground for debate, the matter has been settled by the holding of the State Supreme Court in the United Fuel Company Case that the statute embraces companies furnishing natural gas.

[4, 5] 4. The statute is not subject to the objection that it attempts to authorize the Commission to take property without due process of law in that it makes no provision for notice and a hearing before fixing rates. The complainants were entitled to notice and a hearing, but express statutory requirement for such notice is not essential, for the reason that the constitutional requirement that there shall be notice and an opportunity to be heard is a part of the law governing the Commission. As the statute is silent on the subject, the presumption is that the Legislature intended the Commission to comply with the Constitution, not to violate it. Such commissions are under two laws, namely, the statute law of the state, which confers upon them certain powers over public service corporations, and the constitutional law of the state and of the United States, which requires that they shall exercise the powers conferred by statute only by due process of law, that is, after giving the companies due notice and opportunity to be heard. A statute is invalid which requires something to be done which is forbidden by the Constitution, but it cannot be essential to the validity of a statute that it should enjoin obedience to the Constitution. Paulsen v. Portland, 149 U. S. 30, 13 Sup. Ct. 750, 37 L. Ed. 637; Chicago, B. & Q. R. R. v. Nebraska, 170 U. S. 57, 18 Sup. Ct. 513, 42 L. Ed. 948; French v. Barber A. P. Co., 181 U. S. 324, 21 Sup. Ct. 625, 45 L. Ed. 879.

[6] 5. We are unable to agree that the fixing of the rates to be charged by complainants to their customers in West Virginia is an unlawful regulation of interstate commerce. The regulation of companies engaged in the transportation of gas is expressly excluded from the scope of the interstate commerce statute. Neither the West Virginia statute nor the orders of the Commission purport to interfere in any manner with the transportation of natural gas from West Virginia to other states. Nothing is attempted except the regulation of the prices of natural gas to the citizens of West Virginia to be charged by corporations operating in West Virginia under state authority. The action of these corporations in uniting their operations with those of like corporations of Ohio and Pennsylvania in pumping gas into a common

system of pipes supplying customers in the three states may produce the result that some gas from Ohio and Pennsylvania comes into West Virginia, although it is undisputed that a much larger quantity of gas goes out of West Virginia into Ohio and Pennsylvania than can possibly come in from these states. But this interflow of gas from one state to another according to the pressure from the main gas pipes as common reservoirs cannot affect the power of the state of West Virginia to make reasonable regulations as to rates for gas furnished to its own citizens. West v. Kansas Gas Co., 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193, relied on by complainants, has no application, for in the present case no effort is made to prevent the transportation and sale of natural gas from West Virginia into other states. It is not necessary to decide whether the Congress may not regulate charges for natural gas under such conditions, and under the well-known rule the court should not anticipate that question. In the present state of the law, the Congress having taken no action, it was clearly within the power of the state Legislature to provide for the protection of its own citizens against excessive charges. If it be assumed that interstate commerce will be incidentally affected, yet the regulation of the local charges of a natural gas company as a public service corporation is within the police power of the state until the Congress sees fit to act. The recent and full review of the subject by the Supreme Court in the Minnesota Rate Cases, Simpson v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, leaves no room for discussion. The statute falls clearly within the principle there laid down by the court after setting out the limitations on state action:

"But within these limitations there necessarily remains to the states, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction, although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending federal intervention. * * * Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the state appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the federal power."

[7] 6. The objection is made that the Commission had no authority under the statute to institute of its own motion an investigation into the reasonableness of rates, to find them unreasonable, and to direct a change to rates which it concluded from the investigation to be reasonable. True, section 11 confers the right on the individual citizen to make formal complaint and to have a hearing on it, in case the public service corporation does not, after notice, "satisfy such complaint," but this method and procedure is not exclusive; for section 5 confers the power to investigate without the limitation that the investigation must be on complaint of a citizen, and also to change rates found to be unreasonable or unjust into just and reasonable rates. The implication is clear that the rates may be changed in consequence of the investigation that the Commission is authorized to make of its own mo-

tion. The authorities relied on by complainant's counsel do not support the objection.

7. Nor is there any force in the position that the complainants did not have due notice. Section 2 of the statute (Laws 1913, c. 9) provides:

"The Commission shall prescribe the rules of procedure and for taking evidence in all matters that may come before it, and enter such final orders as may be just and lawful.

"In the investigations, preparations and hearings of cases, the Commission may not be bound by the strict technical rules of pleading and evidence, but in that behalf it may exercise such discretion as will facilitate their efforts to understand and learn all the facts bearing upon the right and justice of the matters before them."

The formal notice served on the corporations clearly stated that an investigation would be entered upon to ascertain whether certain proposed increases in rates were excessive and discriminatory or just and reasonable. This notice plainly indicated that if the rates proposed and those in force were found to be unjust and unreasonable they would be set aside and just and reasonable rates substituted. Indeed, this was the construction of the statute adopted by one of the counsel for complainants in his opening statement to the Commission.

[8] 8. The complainants contend with earnestness that they were denied due process of law in that: (1) Their leading counsel was required by the Commission to retire from the cause; and in that (2) the Governor of the state improperly interfered in the hearing, and the Commission acted in subservience to his will. If these charges be established, then the hearing was inadequate and manifestly unfair, and it would be the imperative duty of the court to enjoin rates based on it. Interstate Commerce Commission v. L. & N. R. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431; Interstate Commerce Commission v. Baird, 194 U. S. 25, 24 Sup. Ct. 563, 48 L. Ed. 860.

The investigation was commenced before Commissioners Ogden and Bronson at Wheeling on October 31, 1913. The taking of the testimony began on November 17, 1913, and the complainants introduced much evidence tending to show that the rates charged and proposed by them were reasonable. The Commission called experts on rates, and the corporations and domestic consumers who had complained to the Commission of excessive rates introduced testimony tending to support their contention. An adjournment was taken until January 20, 1914, and without objection the matter was taken up before the Commission on that date at Charleston. Counsel not being ready to proceed, there was an adjournment to February 9th, and then occurred the proceedings on the part of the Commission which it is alleged were so manifestly arbitrary and partial as to deprive complainants of a fair hearing. The complainants submitted the following in addition to the grounds of objection made at the beginning:

"Influences have been exerted upon members of this Commission by the executive branch of the government, which without right or authority has been permitted to direct and dictate the action and procedure of said Commission, and which has expressed the intention of controlling the final decision of said Commission, the members whereof not having been as yet con-

firmed by the Senate, their names or any of them may be withdrawn by said executive before confirmation, and therefore hold office at the will of said executive, whereas the very fundamental principles of the Anglo-Saxon system of administration of law and justice, a system prevailing in West Virginia, requires that the members of any tribunal by law vested with power to sit in judgment upon the rights, property, and liberty of the subject shall be unbiased, unprejudiced, and uncontrolled, free to decide according to the very right of the cause, and answerable only to their country, their conscience, and their God."

After some acrimonious discussion between the Attorney General and counsel for complainants the Commission gave permission to counsel for complainants to show the basis of the charge of undue influence by the Governor of the state. Counsel's efforts to make the showing resulted in nothing except the letter of the Governor set out in the margin,[1] and a statement by Commissioner Bronson of a telephone conversation between himself and Commissioner Ogden during the hearing at Wheeling, to the effect that "two other members of the Commission would come to Wheeling that night and pass the necessary resolution forbidding the increase in rate that was being requested by the Manufacturers' Light & Heat Company." In the excitement engendered by

[1] January 9, 1914.

Public Service Commission, Charleston, West Virginia—Gentlemen: It is my desire that no further hearings be held by your Commission outside of your courtroom in the State Capitol, until directed by me. If there are any parties who have claims to present to the Commission, the information can be secured before a notary public or some other person who has authority to administer an oath, and the information can then be presented to the Commission for consideration, or the parties can come before the Commission personally.

I am very desirous of having your Commission take the Manufacturers' Gas Case up on January 20th and bring this investigation to a speedy termination, and this must be done in your courtroom at the Capitol.

I feel that the Manufacturers' Gas Company should not have been permitted to raise their rates or even to indicate on their bills their intention to raise the rate, until the question of rate making had been decided by your Commission. No attention has been paid to the violations of the general order that was passed by your Commission some months ago, which had for its purpose, as I understand, the restraining of any public service corporation doing business in this state from raising their rates until permission had been secured from your Commission. If you permit one public service corporation to disregard an order of this kind, what treatment must you expect from other public service corporations of the state? This order should be considered sacred by the Commission, and any infraction or disregard by a public service corporation of this order should be taken up and vigorously resented by injunction or other court proceedings which will protect the orders and rulings which your Commission may issue from time to time. I feel that by permitting the Manufacturers' Gas Company to impose upon the general order that was issued by your Commission some months ago, and making no effort to prevent them from raising their rate in Hancock and Brooke counties and in other counties, when the increase in rate is permitted to appear in the bill with a gentlemen's agreement that the increased rate be not collected until your Commission has decided as to whether or not a raise in the rates will be permitted, you will compromise yourself, and this will give you no little concern in the future. It is my desire that a full and free investigation be made of the Manufacturers' Gas Company Case just as soon as possible, and that we have a decision from the Commission at the earliest possible time.

Very respectfully,                    [Signed] H. D. Hatfield.

the charge against the Commission, Commissioner Ott made the re- mark set out in the marginal extract from the proceedings,[2] indicating his own desire that Mr. Weil, the leading counsel for the gas companies, should withdraw from the case. Commissioner Ogden, who was presiding, announced that Commissioner Ott expressed only his own view, and not that of the Commission, but that no further interrogation of a commissioner from his seat would be permitted. Mr. Weil then called Mr. Fitch, an expert, who testified that he had been requested by the Governor, as well as by the Commission, to make an examination of the property of the gas companies concerned. Mr. Weil thereupon said he had no further competent testimony, unless he were allowed to prove, by one of the commissioners, a conversation of which he had heard between the Governor and a commissioner. Commissioner Bronson then stated that he had no objection to being examined as to any conversation with the Governor or any one else, and other members of the Commission invited Mr. Weil to state anything he knew tending to show improper conduct on the part of any commissioner.

At the afternoon session on the same day Mr. Weil announced his withdrawal from the case on account of the remark of Commissioner Ott. His associate counsel also announced their withdrawal because they could not proceed without Mr. Weil who was most familiar with the matter. The acting chairman, Commissioner Ogden, expressed his regret at the withdrawal of counsel; and, though at first refusing to do so, counsel finally asked in an indefinite way for a continuance. Upon inquiry by the acting chairman, an officer of the Manufacturers' Light & Heat Company, who was present, expressed his inability to answer then or on the next day what they would do about representation. The Commission then ordered the inquiry to proceed, and continued to take testimony until February 13, 1914; the gas companies taking no part.

We have set out the proceedings with a detail, which may be justly criticised as excessive, because fairness and integrity of a commission

---

[2] "As far as the Commission is concerned, Mr. Weil, this Commission is here to hear the evidence in this case, and we are going to decide on the evidence as you present it—we are going to decide it fairly and impartially. And if this Commission is vested with the powers you have said awhile ago, equal to the Czar of Russia, personally I would be glad to have you withdraw from this trial. You have made some statements that have made yourself obnoxious to this Commission, and it would be fair to your client for you to get out of this case and let your other attorneys go on with it. That is my sentiment in this case. If I have that power that you delegated to me awhile ago, as the Czar of Russia, I am asking you to withdraw now. I don't think I have such power, but if I have, on your own statement, I want you to withdraw from the case.

"Mr. Weil: I don't think we will have any difficulty on that score whatever—none whatever.

"Chairman Ott: You made the statement here that we are crooks. I have had no outside influence brought to bear upon me in this case, and this matter of bringing this case to Charleston was considered before ever that letter was written, and my Brother Commissioner, Mr. Kilmer, had written an order to that effect, and we did it for the purpose of the whole Commission hearing this evidence as it was given. Whatever judgment I pass in the case is going to be unbiased and honestly and fair between you and the other people."

like this is of so great importance, not only to the commissioners themselves and the private interests concerned, but to the public, that courts should examine charges of unfairness and lack of integrity with scrupulous care. The solemn responsibility of making such charges can only be justified by proof of them. Evidently they should be specific and supported by statements of the facts relied on, verified by a responsible person. The charges in this instance were mere conclusions of counsel, no facts were stated, and there was no verification. The Commission should have required verified allegations against its members or a withdrawal of the charge, as a condition of allowing counsel to proceed in the cause.

The testimony offered entirely failed to sustain the imputation against the Commission. It would be indecorous for this court to either commend or condemn the action of the Governor further than to ascertain whether the Commission was improperly influenced by him. The letter of Governor Hatfield condemns the arrangement by the Commission with the gas companies pending the investigation; it presses upon the Commission the importance of a speedy investigation and decision, and insists that the investigation should take place at the rooms of the Commission at the Capitol. There is not in it any expression of opinion as to the merits of the controversy. It was stated by one of the commissioners that the change from Wheeling to Charleston had been decided on before the Governor's letter was received, but even if the letter influenced the Commission to make the change, it is not shown that the change was wrong or how it could have affected the result. The telephone conversation between two commissioners was of no significance, being a mere suggestion as to the course to be pursued pending the hearing. The suggestion was not adopted; and all know that when men consult, measures are often honestly proposed as right and then rejected even by their authors as unjust.

9. Counsel were not justified in withdrawing from the proceedings. It is true that the bar and others have reason to expect from judges and others to whose authority as presiding officers they must submit the most scrupulous courtesy, but ideal conditions cannot be demanded. Acerbity in official action or speech is rarely justified, and in this case, notwithstanding the provocation, it would have been better had Commissioner Ott not expressed the desire for Mr. Weil to withdraw; but, since it is not necessary, we express no opinion as to the length a public service commission may go in vindicating its dignity when charges affecting its fairness are made and not established. The expressed wish of one commissioner did not legally nor ethically compel withdrawal, when the acting chairman speaking for the majority invited Mr. Weil to remain; and the asperity of Mr. Ott by no means proved that he would not try to decide the controversy on its merits.

On February 13, 1914, Acting Chairman Ogden announced that all persons interested would be allowed to offer on the next day any evidence germane to the issues, and to recall any of the witnesses for examination. On February 14th Mr. W. C. Neill announced that on account of his interest as an employé of the Manufacturers' Light & Heat Company he had attended the hearing on his own responsibility

without authority to represent the company; that he was then authorized to appear specially merely to make known to the Commission the desire of the companies to cross-examine the witnesses and to offer testimony in rebuttal if time should be given, "sufficient after the testimony shall have been transcribed, to enable counsel to carefully examine the same and have such cross-examination prepared."

While the investigation was in progress stenographic reports of the testimony had been sent to the Pittsburg office of the companies, and its counsel and officers had been advised by Mr. Neill of the course of the proceedings. Yet with all this, at the termination of the hearing they refrained from having counsel present, authorized to go on with the investigation, or even to agree with the Commission on their behalf for a future day. It is true, Mr. Neill agreed, as far as he could agree, that counsel would proceed on February 16th, but he was not authorized to bind the gas companies. Under these circumstances we think there was clearly ground for the Commission to hold that sufficient opportunity had been given to the gas companies to be heard, and to exercise the discretion to close the hearing. It is to be born in mind that it is not the province of this court to say whether the Commission exercised its discretion wisely, but to decide whether it acted so unreasonably and arbitrarily as to deny to the gas companies a fair opportunity to be heard. There was opportunity which was lost for the want of diligence and promptness. The gas companies took the chance of being sustained in their refusal to be represented before the Commission. We have shown they had no adequate reason for their refusal, and the court can give them no relief for their default.

[9, 10] 10. This difficulty hangs to the allegation of the bill that the rates fixed are confiscatory. Looking alone at the evidence before the Commission, no doubt can exist and no serious, contention was made to the contrary that there was justification for the reduction in the rates, ranging from 1 to 7 cents a thousand feet. The complainants' case then depends upon their position that it is shown by the affidavits presented to this court that the witnesses before the Commission misapprehended the accounts and bookkeeping of the Manufacturers' Light & Heat Company, and were mistaken in a number of important statements. The court is asked to hold that these ex parte affidavits must prevail over the testimony taken before the Commission, and upon them to adjudge the rates to be confiscatory. This cannot be done for two reasons: The complainants having had an opportunity to present their evidence to the Commission and to cross-examine the witnesses, and having failed to do so, it would be usurpation on the part of the court to set aside the finding of the Commission on the ground that if the complainants had offered their testimony, it would have tended strongly to produce a different result. The second reason is that, giving full consideration and force to the affidavits as if the affiants had testified before the Commission, it cannot be questioned that there was ground for difference of opinion among reasonable men as to the reasonableness of the rates charged and of the rates fixed by the Commission. True, the affidavit of Ratcliffe, the treasurer and comptroller of the managing company, is to the effect that the

average rate fixed by the Commission to be charged in West Virginia is 12.76 a thousand feet, based on the deliveries of 1913, and that the average cost of production for four years, 1910, 1911, 1912, 1913, was 12.52, without allowing anything for depreciation or interest on the investment. There is much other statistical information in the affidavits concerning the expenses, dividends, debts, cost of boring, loss in dry wells, and the peculiar risks and uncertainties of the business of furnishing natural gas. All this tends strongly to show that at the rates fixed by the Commission the business in its entirety would be conducted at a loss. But, assuming all these statements to be true, they are far from convincing that the rates fixed for supplying natural gas to customers in West Virginia do not allow a reasonable profit. For they relate to the entire operations of the Manufacturers' Light & Heat Company, including its business in Ohio and Pennsylvania. The witnesses for complainants say that no separate account is kept of the companies chartered in West Virginia and operating there, the average cost above stated being for the entire operations of the Manufacturers' Light & Heat Company, including its business in Ohio and Pennsylvania. The testimony is undisputed that the main source of natural gas supply is in West Virginia, and that the cost of supplying gas to consumers in that state is necessarily much less than in the other states. It seems obvious that West Virginia corporations supplying gas to the citizens of that state from wells in the state cannot say the rates fixed to consumers in West Virginia are confiscatory, because at the same rates the companies would lose money on business which they had chosen to conduct in other states in association with corporations of those states. Even if it be conceded that interstate commerce is involved, the principle must be regarded settled beyond dispute.

"The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business." Smyth v. Ames, 169 U. S. 466, 541, 18 Sup. Ct. 418, 432 (42 L. Ed. 819).

The case has no analogy to Houston, etc., R. R. Co. v. United States, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341, decided by the Supreme Court June 8, 1914. Under the familiar facts of that case the rule stated was:

"Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority, and the state, and not the nation, would be supreme within the national field."

Here, as we have seen, if federal authority embraces the right to make rates for natural gas, it has not been exercised; and there is nothing in the record showing that the rates ordered will unduly

favor customers of natural gas in West Virginia over customers in other states. It would hardly be contended that lower rates near the source of supply will be confiscatory, unjust, or discriminatory because the companies may have to charge higher rates at more distant points in other states for a supply involving greater expense for piping and pressure. Nor can the court assume that the public authorities of the other states will not, in adjusting rates, take into account the difference in the expense of supplying the gas.

The fact that the Manufacturers' Light & Heat Company may have improvidently accepted franchises from municipalities in Ohio and Pennsylvania requiring gas to be furnished at the same rates charged in West Virginia, and that reductions at these points would require gas to be furnished there at less than cost, may be worthy of consideration by the Commission in prescribing the rates in West Virginia. But it cannot be controlling, for to hold it so would be to enable the gas companies to contract away the police power of the state of West Virginia to require reasonable charges for its own citizens.

[11] In invoking the interference of this court with the actions of the duly constituted state authorities the complainants assumed the burden of showing with reasonable certainty the invasion of rights affirmed or conferred by the Constitution or laws of the United States. The court cannot set up views it might have reached of what ought to have been done, against the conclusions of the Commission which have a reasonable basis of support in the evidence. San Diego Land Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; San Diego Land Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892; Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764.

Our conclusion is that the complainants have failed to make out a prima facie case of violation of any right guaranteed by the Constitution or statutes of the United States; and the application for a temporary injunction must be refused.

PRITCHARD, Circuit Judge, and DAYTON, District Judge, concur.