No. 20,324.

THE STATE OF KANSAS, ex rel. H. O. CASTER, as Attorney for the Public Utilities Commission of the State of Kansas, et al., *Plaintiff*, v. THOMAS J. FLANNELLY, as Judge of the District Court of Montgomery County, and JOHN M. LANDON et al., as Receivers of the Kansas Natural Gas Company, *Defendants*.

No. 20,360.

THE STATE OF KANSAS, ex rel. JOHN S. DAWSON, as Attorney-general, etc., v. THE INDEPENDENCE GAS COMPANY et al. (THE PUBLIC UTILITIES COMMISSION OF THE STATE OF KANSAS, *Appellants;* JOHN M. LANDON and R. S. LITCHFIELD, as Receivers, etc., *Appellees*).

1. GAS—*Receivership—Order of Utilities Commission Fixing Rates—Injunction—No Legal Service—No Jurisdiction.* The district court of Montgomery county, in an action there pending, appointed receivers to take charge of and operate the property of a public utility, and afterward, on the application of the receivers, made the public utilities commission party defendant in that action. A petition against the commission was then filed in the action by the receivers and summons was issued out of that court and served on the commission in Shawnee county. In this petition the receivers asked that the commission be enjoined from enforcing certain orders made by it at Topeka, in Shawnee county. *Held*, that the district court did not thereby obtain jurisdiction of the commission and could not make any lawful order, or render any valid judgment against the commission.

2. SAME—*Receivers of Gas Company—Under Control of Utilities Commission.* Receivers, properly appointed by a court of competent jurisdiction, in possession of and operating a public utility in this state, are under the control of the public utilities commission in the same manner and to the same extent as the owners of the utility would be if they were operating the public utility themselves.

3. SAME—*Utilities Commission Has Exclusive Power to Fix Gas Rates.* The public utilities commission has power to fix rates for the service rendered by a public utility, although that utility is being operated by receivers appointed by a court of competent jurisdiction.

4. SAME—*Gas Imported—Mixed with Kansas Gas—Sold to Kansas Consumers—Not Subject to Interstate Commerce Law.* It is no part of interstate commerce to sell natural gas to the consumers thereof in this state, where the gas sold is produced in both Kansas and Oklahoma, and that produced in Oklahoma, after being conveyed in pipe lines to this state, is so commingled, in the pipe lines conveying the same, with the gas produced in this state, that it is impossible to

separate or distinguish that produced in Oklahoma from that produced in Kansas, and after being so commingled it is conveyed from city to city throughout the state, and is there sold to the consumers thereof.

5. SAME—*Sale of Imported Gas—Subject to State Control.* Assuming that the sale of natural gas produced in Oklahoma, from there transported into this state through pipe lines and here sold to consumers throughout the state is interstate commerce, it is not national in its nature, it does not admit of one uniform system of regulation, it is not that kind of interstate commerce which requires exclusive legislation by congress, and until congress. acts it is under the control of this state.

6. SAME—*Enforcement of Orders of Utilities Commission—Mandamus.* A writ of mandamus will not issue to enforce an order of the public utilities commission before it is fully, finally and completely made.

7. SAME. A writ of mandamus will not issue to enforce an order of the public utilities commission fixing rates for the service rendered by a public utility where the rates fixed are unjust, unreasonable, or are not compensatory.

Case No. 20,324. Original proceeding in mandamus. Opinion filed October 4, 1915. Writ denied.

Case No. 20,360. Appeal from Montgomery district court; THOMAS J. FLANNELLY, judge. Opinion filed October 4, 1915. Reversed.

*A. E. Helm,* of Wichita, *Fred S. Jackson,* of Topeka, and *H. O. Caster,* of Oberlin, for The Public Utilities Commission.

*Robert Stone,* and *George T. McDermott,* both of Topeka, for defendant Thomas J. Flannelly.

*O. P. Ergenbright, T. S. Salathiel,* both of Independence, *Chester I. Long,* of Wichita, and *John H. Atwood,* of Kansas City, Mo., for the Receivers.

The opinion of the court was delivered by

MARSHALL, J.: In January, 1912, the attorney-general commenced an action in the district court of Montgomery county, entitled *The State of Kansas v. The Independence Gas Company, The Consolidated Gas, Oil & Manufacturing Company, and the Kansas Natural Gas Company.* The petition charged that the defendants were violating the antitrust laws of the state, and prayed for an ouster of the defendants and the

appointment of a receiver for their properties. The cause was tried October 1, 1912, and judgment rendered February 15, 1913. R. S. Litchfield and John M. Landon were appointed receivers for the Kansas Natural Gas Company. The gas companies engaged in distributing natural gas furnished by the Kansas Natural Gas Company to the consumers were then made parties defendant to the action, were served with a copy of the judgment, and each was restrained from appearing in any other court for the determination of any matter in connection with its contract with the Kansas Natural Gas Company. These receivers were also appointed receivers for the Kansas Natural Gas Company in Missouri and Oklahoma. At the time this judgment was rendered, all the property and assets of the Kansas Natural Gas Company were in the possession of receivers appointed by the United States district court for the district of Kansas, in a suit brought by a bondholder of the company after the action in the state court had been tried. The district court of Montgomery county, upon the rendition of its judgment, directed its receivers to apply to the federal court and ask that court to direct the federal receivers to turn over the property in their hands to the receivers appointed by the state court. Litigation followed, which terminated in all the property of the Kansas Natural Gas Company being turned over to the receivers appointed by the state court. All the property of the Kansas Natural Gas Company is now in the possession and control of these receivers.

In December, 1914, the creditors and stockholders of the Kansas Natural Gas Company entered into a stipulation and agreement fixing the amounts that were due the bondholders, lienholders and stockholders of the Kansas Natural Gas Company and the companies subsidiary thereto. This agreement provided that the receivers might, as expeditiously as possible and whenever deemed advisable by the court, make application to the public utilities commission for compensatory rates for gas. On April 9, 1915, under the direction of the court, the receivers filed with the public utilities commisson an application for compensatory rates for gas. After hearing the application, the commission, on July 16, 1915, made find-

ings and rendered an opinion, stating that in all markets where the net price of gas to consumers is 25 cents per thousand cubic feet the rates should be increased to 28 cents net, but because more than half the gas supplied and marketed .by the receivers of the Kansas Natural Gas Company is sold in the state of Missouri it would be manifestly unfair to permit the receivers to advance the price of gas to their Kansas patrons unless a corresponding increase is made to consumers in Missouri; and further stating that the commission awaits the pleasure of the rate-regulating body or bodies of Missouri having jurisdiction of the subject matter, and if in that state proper and necessary orders be issued establishing similar rates in Missouri, an order, effective simultaneously if possible, will be issued by the commission, fixing the rates as above indicated.

On July 26, 1915, on the application of the receivers, the district court entered an order making the public utilities commission a party defendant in the action in which the receivers were appointed. The receivers then presented a petition to that court, asking that the commission be enjoined from enforcing any and all orders made by the public utilities commission; and that the court, upon the final hearing of the petition, fix and determine a fair, lawful, reasonable and compensatory rate to be paid for natural gas supplied by the receivers in the state of Kansas. Summons and a temporary restraining order were issued and served on the commission in Shawnee county. On August 7, 1915, the public utilities commission appeared specially and presented a motion to the court to quash the summons and service thereof, challenging the jurisdiction of the court on the grounds that neither of the commissioners was served with summons in Montgomery county, and that their official residence was in Topeka, Shawnee county. This motion was denied August 12, 1915. On August 17, 1915, H. O. Caster, attorney for the public utilities commission, filed in this court an application for an alternative writ of mandamus against Thomas J. Flannelly, judge of the district court of Montgomery county, and John M. Landon and R. S. Litchfield, receivers of the Kansas Natural Gas Company, praying that Thomas J. Flannelly, judge of the district court, be commanded to vacate and set aside the order

making the public utilities commission a party defendant in
the action in that court, to set aside the temporary restraining
order in that action, and to dismiss the suit against the public
utilities commission; and praying that John M. Landon and
R. S. Litchfield, receivers of the Kansas Natural Gas Com-
pany, be compelled to perform their legal and public duties or
show cause to this court why they should not do so. To this
petition R. S. Litchfield and John M. Landon filed their an-
swer September 22, 1915, in which they allege that the busi-
ness in which they are engaged—that of producing, transport-
ing and selling natural gas—is interstate commerce, and is
therefore not under the control of the public utilities com-
mission; that the price at which gas has been sold in Kansas
and Missouri is unreasonable, inadequate, unremunerative, non-
compensatory and confiscatory; that unless a reasonable,
proper advance is made in the price of gas it will be impossible
to continue the operation of business; and that the rates and
regulations prescribed in the opinion of the commission ren-
dered July 16 are unreasonable, unremunerative, noncompen-
satory and confiscatory, unlawful and void, and will deprive
the receivers of the property in their possession and under
their control without due process of law, in violation of the
fourteenth amendment of the constitution of the United States.

On August 24, 1915, the public utilities commission filed
in the district court of Montgomery county its demurrer to
the petition of the receivers, not waiving any rights under
the motion to quash, and, continuing to challenge the juris-
diction of the court, demurred on the grounds that the court
had no jurisdiction over the persons of the defendants, or
either of them, and had no jurisdiction over the defendant,
the public utilities commission, or the subject matter of the
action. This demurrer was overruled August 25, 1915. The
public utilities commission then announced in open court
that it elected to, and did, stand upon its demurrer. The
commission did not plead further. On the same day notice
of appeal from the decision of the court in overruling the
demurrer of the public utilities commission was filed. The
appeal was filed in this court September 9, 1915. After the
demurrer was overruled, the receivers introduced evidence in
support of their petition, and on August 27 the court found

that the receivers are engaged in interstate commerce; that the findings of the commission and its orders, or threatened orders, are a cloud upon the title to the properties and assets of the Kansas Natural Gas Company in the hands of receivers of the court; that they are unreasonable, unremunerative and confiscatory in effect; and specially found that the commission's findings and threatened orders with reference to the allowance of waste in the distributing systems are unlawful, unreasonable and confiscatory; are an interference with the administration of the property by the court, a taking of the estate in the hands of the court without due process of law, a dissipating and wasting of the assets of the estate in the hands of receivers, and an interference with interstate commerce in which its receivers are engaged; and then permanently enjoined the public utilities commission, its members, officers and attorneys, from putting into force or effect the opinion, order, and findings thereof. The court further found that it will be advisable, beginning with October 1, 1915, to establish a rate of 30 cents, to be changed or modified as experience shall hereafter require, and ordered the receivers to establish, charge and collect a rate of 30 cents per thousand cubic feet of natural gas to consumers thereof, except in Montgomery county; the rate to continue until the further order of the court. September 22, 1915, a supplemental petition to the petition for a writ of mandamus was filed. In this the proceedings of the district court subsequent to denying the motion to quash the summons against the public utilities commission were set out. Upon the hearing in this court it was agreed in open court that all the evidence introduced on the hearing before the public utilities commission might be considered as introduced in this court in the mandamus proceeding.

The gas sold by the receivers is produced in both Kansas and Oklahoma. It is transported from the wells through pipe lines beginning in Oklahoma, entering the state of Kansas near Coffeyville, at which place gas is first distributed and sold to consumers. The remainder is transported north through pipe lines into which gas from wells in Kansas is conveyed, and the gas from Oklahoma and Kansas is then transported through the same pipe lines and through com-

pressing stations to Independence and north and east through-out this state, and after supplying the consumers in this state it is transported into the state of Missouri, where it is sold to other consumers. After the gas from this state is discharged into the pipe lines with the gas from Oklahoma, it is impossible to distinguish one from the other or to separate one from the other. About 85 per cent of the gas sold is produced in Oklahoma, and 15 per cent is produced in Kansas. About 60 per cent of the gas sold is sold in Missouri, and 40 per cent is sold in Kansas. The gas sold in Kansas is delivered to the consumers thereof in the several cities by distributing companies operating under franchises obtained by the distributing companies from the cities, fixing the rates to be charged customers for gas. These distributing companies act as the agents of the Kansas Natural Gas Company in the distribution and sale of gas. The price received for gas is divided between the distributing companies and the receivers on a percentage basis. The gas is not sold by the receivers to the distributing companies. It is delivered from the pipe lines of the Kansas Natural Gas Company, under the control of the receivers, into the pipe lines of the distributing companies, and is through these pipe lines conveyed from the pipe lines of the Kansas Natural Gas Company to the consumers. The gas is consumed as fast as it is sold, and is consumed immediately after passing through the meter measuring the gas to the consumers.

1. The first question presented is, Did the district court of Montgomery county obtain jurisdiction of the public utilities commission by the proceedings had against the commission in that court? The receivers cite *White v. Ewing*, 159 U. S. 36, 40 L. Ed. 67; *Peck v. Elliott*, 24 C. C. A. 425, 79 Fed. 10, 38 L. R. A. 616; *Savings Bank v. Simpson*, 22 Kan. 414, and a number of other authorities.

In 40 L. Ed. 67, we find this headnote to *White v. Ewing*, supra:

"Any suit by or against a receiver appointed in a general creditors' suit pending in the United States circuit court against a corporation, whether for the collection of its assets, or for the defense of its property rights, is ancillary to the main suit, and within the jurisdiction of such circuit court, regardless either of the citizenship of the parties or of the amount in controversy."

In *Peck v. Elliott,* supra, this language is found:

"For the purpose of collecting in choses in action, the court might direct its receivers to institute independent suits in that or courts of the state, or cause such debtors to be made defendants in the principal cause, and determine for itself any question which might be involved by the defenses to the claim." (p. 427.)

In *Savings Bank v. Simpson,* supra, this court said:

"The appointment of a receiver by a district court secures to that court the power to control, at its discretion, all controversies which affect the property placed in his custody as such receiver." (Syl. ¶ 1.)

The public utilities commission calls attention to sections 50 and 55 of the code of civil procedure. These sections, in part, read as follows:

§ 50. "Actions for the following causes must be brought in the county where the cause, or some part thereof, arose:

"*Second*—An action against a public officer for an act done by him in virtue or under color of his office, or for neglect of his official duties.

§ 55. "Every other action must be brought in the county in which the defendant or some one of the defendants resides or may be summoned."

The language used in upholding the authority of a court over all matters affecting the property or estate in the hands of receivers is very broad. However, there must be some limit to the authority of a court to bring before it all parties who may have or set up a claim adverse to the receivers. If the receivers claim that certain real property belongs to the estate in their hands, and another party is in possession and claims adversely to the receivers, and it is necessary to bring an action to obtain possession thereof, where will the action be brought? In the court and in the cause in which the receivers were appointed, or in the county where the land is situated? There is but one reasonable answer to this question, and that is, that such an action must be brought in the county where the land is situated. If the receivers, as a part of the assets of the estate in their hands, hold a mortgage on real property situated in another county, and it is necessary to foreclose that mortgage, where must that foreclosure take place? Necessarily in the county where the land is situated. If it becomes necessary to sue on a note held by receivers, and all those liable on the note reside outside the county in which the receivers have been appointed, where will that action be brought? The language in a number of decisions is broad

enough to say that it may be brought in the action appointing the receivers, and necessarily in that county. This apparently disregards the statute prescribing where actions shall or may be brought. Does the code, prescribing the venue of civil actions, apply to receivers the same as to other litigants? The rules giving the court appointing receivers such extensive jurisdiction are not statutory. They are rules of equity. Their purpose is to protect the estate that is in the custody of the law and under the control of the court. But these rules should not—and we are constrained to hold that they do not—interfere with the rules enacted by the legislature for the protection of those against whom legal proceedings may be instituted.

The receivers contend that under section 50 of the code, *supra,* they have the right to sue the public utilities commission in Montgomery county, because part of their cause of action arose in that county. It is argued that the receivers are residents of Montgomery county and have a right to have compensatory rates for gas; that these rates have been denied them; and that under the authorities, where the statute is qualified by the words "or some part thereof," the venue is either where the receivers reside, who had the right, or where the commissioners reside, who denied the right.

What part of the receivers' cause of action against the commission arose in Montgomery county? They say their right to sue, their right to protect the property in their control. All persons have a right to sue when their rights of person or property are invaded. A state officer acting under the law, at the capital, may perform an act which some individual somewhere in the state believes invades his rights or does him a wrong. Such party can not sue unless his rights have been invaded, but that invasion by an act wholly performed in another county does not give the aggrieved party the right to sue outside the county where the act was done. The action in the district court stands just the same as if the receivers were attempting to contest the validity of an act of the legislature, and were seeking to enjoin the attorney-general, or the auditor of state, or the tax commission, or the state board of health from proceeding thereunder.

The evident purpose of the statute is to confine actions on

account of the conduct of officers to the county or counties in which the act or acts of the officers were done. These views are supported by *Clay v. Hoysradt,* 8 Kan. 74, where this court said:

"The language of this section is plain, and needs no comment from us. By it proceedings against public officers for official acts are referred to the courts of the county where the acts are done. It is an expression of the purpose of the legislature to localize suits against officers. It relieves them from the necessity of deciding between the conflicting orders of courts of different counties. They are amenable only to the courts of the county in which they are acting." (p. 80.)

(See *Fay v. Edmiston,* 28 Kan. 105, 108.)

This question should not be disposed of without an examination of section 35 of the code of civil procedure, which reads:

"Any person may be made a defendant who has, or claims, an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the question involved therein."

The state of Kansas is plaintiff in the action in the district court of Montgomery county. The public utilities commission does not claim adversely to the plaintiff. The commission has no interest whatever in the controversy. It is not a necessary party to a complete determination or settlement of the questions involved in the action, as disclosed by the pleadings. The commission may make an order, under the law, that affects the property involved in the controversy, but that does not make the commission a necessary party to a complete determination of the matters in controversy. State officers executing laws affecting property in the hands of receivers are not for that reason necessary parties to the action in which the receivers were appointed. Neither is the public utilities commission a necessary party in the action now pending in Montgomery county. It follows that the district court did not have jurisdiction of the public utilities commission, or of any member of it.

2. The next question is, Are the receivers subject to the control of the public utilities commission, under the public utilities act? (Laws 1911, ch. 238.) The Kansas Natural Gas Company, whose property is now in the possession of the receivers, and whose business is now being conducted by them,

was engaged in the business of a public utility. When the receivers continue to do the same business and render the same service as that performed by the Kansas Natural Gas Company they are a public utility, as defined in the public utilities act, and are subject to the provisions of the act. The appointment of receivers to carry on the business of a public utility does not withdraw that public utility or its receivers from the control of the laws of the state. The public utilities commission can make the same orders, rules and regulations governing these receivers and the property in their control that they could have made concerning the Kansas Natural Gas Company and its property before the receivers were appointed. The receivers have the same right to appeal to the courts that the Kansas Natural Gas Company had—no greater, no less.

3. Who has the power to fix the rates at which natural gas shall be sold by the receivers of the Kansas Natural Gas Company, the public utilities commission, or the court appointing the receivers? The legislature has said that the public utilities commission shall fix these rates. The courts have repeatedly declared that the courts can not fix rates, and that fixing rates is a legislative function. When rates are fixed, the courts can ascertain whether or not they are in violation of law or of some constitutional provision. But courts have not the authority to determine what rates will be reasonable, just, compensatory, or legal, and then put in effect those rates. The commission can not finally determine what rates will be legal and will not violate constitutional provisions. The commission is the body authorized by law to say in the first instance what rates are legal and will not violate constitutional provisions, but the courts must finally say whether or not the rates fixed are illegal or do violate such provisions. The one function is legislative, while the other is judicial. The commission can not invade the field occupied by the court; neither can the court invade the field occupied by the commission. The commission must act first, and the courts afterward.

4. It is contended that the receivers are engaged in interstate commerce, and for that reason are beyond the control of the public utilities commission. That the transportation of natural gas from one state to another is interstate commerce must be conceded. (*West v. Kansas Natural Gas Co.*, 221

U. S. 229, 55 L. Ed. 716, 31 Sup. Ct. Rep. 564, 35 L. R. A., n. s., 1193; *Haskell v. Cowham*, 109 C. C. A. 235, 187 Fed. 403.) Numerous other cases might be cited. However, that is not the question we have to determine. Our question is, When does the natural gas that is sold by the receivers in the several cities in this state cease to be an article of interstate commerce? In 7 Encycl. of U. S. Sup. Ct. Rep. 298, we find a clear and condensed statement of the rules to be deduced from the decisions of the United States supreme court, as follows:

"The general rule is that as long as an article imported remains in the hands of the importer in the original and unbroken package in which it was imported, it is protected by the commerce clause of the constitution from the interference of state laws, and that it is only when the original package has been sold by the importer or has been broken up by him or has otherwise become mixed with the common mass of property in the state, that it becomes subject to state legislation."

(The original package rules will be of some assistance in determining whether or not the receivers' sale of gas in this state is interstate commerce. The original package of gas is broken when the first gas is taken out of the pipe lines and sold in this state. Thereafter the gas ceases to be an article of interstate commerce. The gas, when sold, had become mixed with the common mass of property in this state by being so commingled with gas produced here as to completely lose its identity. It is a matter of common knowledge that service pipes from the pipe lines of the distributing companies to private residences and other buildings belong to the owners of the property served, and installations are made at their expense. If the analogy of original packages or importation of property in bulk applies to gas in the mains, it ceases to apply when thousands of service pipes are filled with gas to be drawn off at such times and in such quantities as the individual consumer desires. Interstate commerce is at an end when the bulk of the imported gas is broken up for indiscriminate distribution to individual purchasers at retail sale. The gas then becomes mixed with the common mass of property in the state. To exclude the power of the state from control over an article imported into it, it is necessary that the article be capable of being pointed out and identified, and the owner be able to say, "This came from another state, and has

not yet become commingled with the mass of property in this state so as to make it a part of that property."

All property now owned in this state, and not produced here, was at one time a part of interstate commerce. The goods on the merchant's shelf, the wagons and plows in the farmer's field, the horses and cattle that he has imported from another state, were all a part of interstate commerce at one time, but have ceased to be such, although they have not been sold and are still owned by the persons who imported them. These ceased to be under the protection of the interstate commerce clause of the constitution when they became a part of the property of this state. The farmer who imports a wagon, a horse, a carload of corn, or a piano, may or may not intend to sell the article imported. Does the interstate commerce character of this property attach until it is sold? It does not. It can not. A carload or a trainload of wheat may be shipped from this state to Kansas City, Mo., and be there placed in an elevator and mixed with another carload or trainload of wheat from some county in Missouri, and may be held for delivery to some one who has ordered it, or be held for sale to any one who will buy it. Will that wheat from Kansas, after being commingled with the wheat from Missouri, be under the protection of the interstate commerce clause of the federal constitution and outside the control of Missouri, under laws legally enacted by its legislature? If this question is answered in the affirmative, it extends interstate commerce much farther than any decision of any court yet rendered of which we have any knowledge or information. Before selling natural gas it became necessary to obtain franchises from the several cities under the laws of this state. These laws provided that in certain classes of cities the franchises might name the price at which gas should be sold. If the business done by the receivers in this state is interstate commerce, and the state has no power to regulate the price at which gas may be sold, the laws providing for fixing rates in franchises were invalid, so far as gas coming from another state is concerned.

5. Granting for the moment that the sale of natural gas under the circumstances disclosed is interstate commerce, it is not national in its nature, it admits of no one uniform system of regulation, and it is not that kind of interstate commerce which

The State, *ex rel.*, v. Flannelly.

requires exclusive legislation by congress. It is therefore sub-, ject to state control until congress acts. In *Jamieson v. The Indiana Natural Gas and Oil Company et al.*, 128 Ind. 555, 28 N. E. 76, 12 L. R. A. 652, the supreme court of Indiana said:

"Upon this point we affirm that natural gas is characteristically and peculiarly a local product, that its production is confined to a limited territory, that because of its local characteristics and peculiarities it is a proper subject for State legislation, and can not, so far as regards local protection, be made the subject of general legislation by Congress; or, at all events, that it does 'not require a uniform system as between the States' for its regulation." (p. 573.)

A very similar question was disclosed in *Manufacturers' Light & Heat Co. v. Ott*, 215 Fed. 940, where this language is found:

"We are unable to agree that the fixing of the rates to be charged by complainants to their customers in West Virginia is an unlawful regulation of interstate commerce. The regulation of companies engaged in the transportation of gas is expressly excluded from the scope of the interstate commerce statute. Neither the West Virginia statute nor the orders of the Commission purport to interfere in any manner with the transportation of natural gas from West Virginia to other states. Nothing is attempted except the regulation of the prices of natural gas to the citizens of West Virginia to be charged by corporations operating in West Virginia under state authority. The action of these corporations in uniting their operations with those of like corporations of Ohio and Pennsylvania in pumping gas into a common system of pipes supplying customers in the three states may produce the result that some gas from Ohio and Pennsylvania comes into West Virginia, although it is undisputed that a much larger quantity of gas goes out of West Virginia into Ohio and Pennsylvania than can possibly come in from these states. But this interflow of gas from one state to another according to the pressure from the main gas pipes as common reservoirs can not affect the power of the state of West Virginia to make reasonable regulations as to rates for gas furnished to its own citizens. *West v. Kansas Natural Gas Co.*, 221 U. S. 229, 31 Sup. Ct. Rep. 564, 55 L. Ed. 716, 35 L. R. A., n. s., 1193, relied on by complainants, has no application, for in the present case no effort is made to prevent the transportation and sale of natural gas from West Virginia into other states. It is not necessary to decide whether the Congress may not regulate charges for natural gas under such conditions, and under the well-known rule the court should not anticipate that question. In the present state of the law, the Congress having taken no action, it was clearly within the power of the state Legislature to provide for the protection of its own citizens against excessive charges. If it be assumed that interstate commerce will be incidentally affected, yet the

regulation of the local charges of a natural gas company as a public service corporation is within the police power of the state until the Congress sees fit to act." · (p. 944.)

Congress has not acted in this field, except to prohibit unfair methods of competition. We hold, therefore, that the receivers are not engaged in interstate commerce when selling natural gas to consumers thereof in this state.

6. ' The commission did not make an order fixing rates for gas at 28 cents per thousand cubic feet. A suggestion is made that when Missouri fixes rates at 28 cents per thousand the commission will fix rates at that figure. The commission may change its opinion. It may not fix those rates. It may leave the rates where they are. It may advance them to 30 cents or 35 cents. Until an order of the commission is fully, · finally and completely made . a writ of mandamus will not issue to enforce it.

7. The last question for our consideration concerns the legality of the rates, both those that are in existence at the present time and those named in the opinion of the commission. ' The commission finds that where the net price of gas to consumers is now 25 cents per thousand cubic feet the rate should be increased to 28 cents. This, in effect, is a finding that the rates now in existence are not compensatory. It then became the duty of the commission to fix compensatory rates, taking into consideration the gas sold in Missouri, assuming that compensatory rates will be fixed in Missouri. However, we may say that obedience to law in making rates in Kansas can not legally be made dependent on obedience to the same law in Missouri. The nonobservance of a law in one state or community is no excuse for the nonobservance of the same law in another state or community. The finding of the commission prevents this court from issuing any writ of mandamus to compel the receivers to continue the sale of gas in those places at the rate of 25 cents. The district court finds that the rate of 28 cents will be confiscatory, and in its findings shows, or at least undertakes to show, among other things, wherein the commission has omitted substantial . amounts which should have been included in the items necessary to be met by the revenue derived from the sale of gas. The commission, in answer to these criticisms of the court, says that some

of the matters criticised were not considered when the matter was before the commission, and that upon others substantially no evidence was submitted; in other words, that these matters of which the court complains were not presented to the commission for its consideration. The evidence before the commission does not meet the objections of the district court. If the findings of the court are correct the rates suggested by the commission are not sufficient to meet the obligations that should be paid by the receivers. The commission says that the salvage value may be safely calculated upon to absorb the principal of the company's second-mortgage bonds. The second-mortgage bondholders are entitled to the same consideration at the hands of the commission as any other creditor or investor. The court made its findings in a proceeding over which it did not have jurisdiction. The public utilities commission was not present when the evidence was introduced which supports these findings of the court, and was not present when the findings were made. The receivers asked the court to fix and determine a fair, lawful, reasonable and compensatory rate to be paid for natural gas supplied by the receivers in the state of Kansas. The court fixed a rate of 30 cents. That was not a judicial act. It was legislative, and the legislature has placed the power to fix the rate with the public utilities commission. The public utilities law requires the commission to fix rates that are just and reasonable. The constitution of the United States prohibits the commission from fixing rates that are not compensatory. A writ of mandamus will not issue to enforce an order of the commission fixing rates that are unjust, unreasonable, or that are not compensatory.

The demurrer of the public utilities commission to the receivers' petition is sustained, and the injunction against the commission is set aside. No writ of mandamus will issue at this time. The action in this court is dismissed as to the Hon. Thomas J. Flannelly, but is retained as to defendants John M. Landon and R. S. Litchfield, for such orders and judgments as may be hereafter made.

DAWSON, J., not sitting.