W. N. REYNOLDS v. ADAMS EXPRESS COMPANY.

(Filed 15 November, 1916.)

**1. Verdicts—Interpretation—Courts.**

A verdict of the jury may be interpreted by proper reference to the pleadings, evidence, and charge of the court.

**2. Courts—Judicial Notice—Express Companies—Carriers of Goods.**

In proper instances the Court may take judicial notice of the fact that express companies are agencies organized for a higher price than that of ordinary carriage, to provide greater security and dispatch in the delivery of freight.

**3. Carriers of Goods—Express Companies—Live Stock—Valuation—Abandonment of Contract—Damages.**

Where an express company has contracted to transport a high brood of mare to its destination, wherein the consignor has agreed to a valuation not to exceed $100 for a less rate, and it is alleged and shown that for a part of the trip the car containing the mare had been placed in an ordinary freight train, in consequence of which it was badly damaged, and that a messenger had not been sent with the mare in the car in accordance with its custom in such transportations: *Held*, the restrictions as to valuation contained in the contract can apply only where the express company has itself complied therewith, and it being shown that the mare was injured in consequence of the defendant's violation of the contract, which for the time being is construed as an abandonment by it of its terms, the entire damage is recoverable, though greatly in excess of the value agreed upon.

**4. Same—Commerce—Interstate Commerce Commission.**

Where an express company, in violation of its contract of carriage, transports a valuable mare in a car, and injury is inflicted upon it by reason of the fact that the car was hauled in a freight train a part of the distance, the fact that it was stipulated in the contract of carriage that the value of the mare should not exceed $100, upon consideration of a less rate, which was approved by the Interstate Commerce Commission, does not preclude a recovery of damages in a greater sum; for the contract of carriage, as approved, contemplates the restriction of recovery as to injuries inflicted by the express company while transporting the mare according to the method required of it under the terms of the contract, and not to those arising from a temporary abandonment thereof.

**5. Carriers of Goods—Express Companies—Contracts—Stipulations Unreasonable—Written Demand.**

A stipulation in an express company's contract of carriage of live stock, requiring that written demand for damages to the shipment be made in thirty days, is unreasonable as to the time, and unenforcible.

**6. Appeal and Error—Objections and Exceptions—Briefs—Oral Agreement—Waiver.**

An exception of record merely mentioned in appellant's brief, without discussion, and not urged on the oral agreement, is taken as abandoned.

**7. Carriers of Goods—Express Companies—Written Demand—Knowledge—
Waiver.**

> The written demand for damages to a shipment of live stock stipulated
> in the contract therefor may be waived by the knowledge of the injury
> by the agents of the carrier and their conduct respecting it.

CIVIL ACTION tried before *Webb, J.,* and a jury, at May Term, 1916,
of FORSYTH.

The action was to recover for injuries to a racing mare, shipped by
express over a route of defendant company from Winchester, Va., to
Hanover, Pa., in September, 1913.

There was denial of liability on the part of defendant, and plea,
further, that in reference to this shipment defendant was a common
carrier, engaged in interstate commerce; that it had filed its schedule
of rates with the Interstate Commerce Commission, and under the
contract of shipment the company's liability, in any event, was re-
stricted to $100. The schedule of rates were presented in evidence in
support of the plea.

On issues submitted, the jury rendered the following verdict:

1. Did the defendant breach its contract, as alleged in the complaint?
Answer: "Yes."

2. If so, was the plaintiff's horse injured by the negligence of the
defendant while being transported in violation of the said contract,
as alleged in the complaint? Answer: "Yes."

3. What damage, if any, has the plaintiff sustained by reason of
said injury? Answer: "$2,500."

Judgment on the verdict for plaintiff, and defendant excepted and
appealed, assigning for error, chiefly, that the jury were allowed to
award damages in excess of the amount specified in the contract.

*Manly, Hendren & Womble for plaintiff.*

*Winston & Biggs, J. C. Buxton, Watson, Watson & Robinson and
R. G. Parker for defendant.*

HOKE, J., after stating the case: The complaint alleged and the
proof on the part of plaintiff tended to show that in September, 1913,
"the plaintiff through his duly authorized agent, H. N. Reaves, and
in the name of said H. N. Reaves, contracted with the defendant to
carry by express two race horses from the town of Winchester, Va.,
to the town of Hanover, Pa., and that said H. N. Reaves paid the
defendant the charges required for the transportation of said horses
by express and contracted with the plaintiff's agent to ship them
by express from Winchester, Va., to Hanover, Pa. When the car
in which the horses were being shipped reached York, Pa., it was

cut off from the express train and placed on the freight yards, where it was allowed to remain for several hours, and was then, in violation of the defendant's contract, attached to a freight train, and the said horses were hauled from York, Pa., to Hanover, Pa., by freight train, which was in violation of the defendant's contract, it having contracted to ship said horses by express. That while the car was being shifted by the freight trains on the yards at York, Pa., and on the route to Hanover, it was handled in such a rough and careless manner that one of the horses, a mare named 'Eudora,' was knocked down twice, and was seriously and permanently injured."

The evidence introduced by plaintiff tended to show, further, that the horses were in a car prepared for the purpose and for use only in connection with passenger train service, and that the witnesses had never known of horses in that kind of car, shipped by express, being connected with freight trains. That the injured mare was a racing animal of unusual success and great promise and was worth $4,500 or $5,000, and that by reason of the injuries received while on the freight yards and being conveyed by freight train her value was reduced to $250 or $400.

In regard to conditions caused by change in the character of the shipment, one of plaintiff's witnesses, D. P. Verner, the mare's keeper, testified, among other things, as follows: "When we reached York, the mare was all right, just like she left Winchester. We got into York some time before day. When I waked the next morning I looked out, and we were in the York yards. I do not know exactly what time we left York, but we left on a freight train of about forty cars. This express car was about the middle of the train. We were in the car, sitting on the side-track at York, and they turned loose three box cars and hit this car and knocked this mare down, and it took two of us to get her up. I looked to see what hit the car, and three box cars were coming, turned loose, and hit the car, knocked two of the horses down and knocked the trunks and sulkeys down on each other, and then they put us on this freight train. They were shifting and making up this freight train with this express car in it. When we started to York they would run a while and stop and knock the cars against each other—just keep on doing that way—and knocked her down about halfway between York and Hanover. When they knocked her down, it took two of us to get her up. Her hip was skinned and all the hair was cut loose on her hind feet. They knocked her down again about halfway between York and Hanover, and we got her up again, and she was awful nervous. I had to stand at her head practically all the way, and the train was running so you could not stand still, and the trunks and sulkeys flapping about and making such a noise, and they

would stop and knock up against the mare and knocked her against the bar 2 x 4 across her breast and knocked the window out at her head— just knocked her around all the way. I stood at her head all the way from York, trying to keep her quiet. They were handling her so rough she could not stand still, and she was excited. They had knocked her down twice and she was nervous, and I was trying to keep her quiet as best I could. It looked like they would be running and all at once stop and throw all of us on the horses. The other caretakers were trying to hold their horses to keep them quiet. When traveling with horses by express, the express company sends an express messenger with us in the car. An express messenger started out with us from Winchester, but I did not see anything more of him after we left York. He would not go in the freight. They are supposed to send a messenger with a car-load of horses. I have traveled a great deal in cars with horses shipped by express. In a shipment by express I never knew a car that I was in put in a freight train before. Ordinarily, express cars are hauled in express or passenger trains. Some of them are through express. When we reached Hanover this mare was in bad condition; looked like she was on the verge of a chill, and could not walk; had to sort of push her along. She looked like she was broken down in the back; walked like a hog broken down in the loins, back of her hind legs. Looked like the meat was cut loose on her hind legs from the hock down to the hoof; right hip skin knocked off and left hip bone was injured; wasn't much skin off of it. There was a piece as big as your two hands on the right hip, but on the left hip just a little place, but it was sorer than the right hip."

For defendant there was evidence tending to show that while it was not customary to ship horses under this kind of contract by freight, it was sometimes done for short distances and when no time would be lost by it. Defendant also introduced the schedule of rates filed with the Interstate Commerce Commission showing the alternative rates for shipment by express where liability was limited to $100 and less sums and an increased rate where valuation exceeded that sum, and relied on a clause in the contract of shipment in which these rates were set forth, the evidence tending to show that plaintiff had selected and made his contract in reference to the lower rate and containing provision that the shipper, in order to avail himself of the lower rates, had valued each horse at $100 and "expressly agreed that in no event shall the express company be liable in excess of the above valuation"; and, in this connection, F. Mantz, division agent of the company, testified as follows:

"This is the contract that I made with Mr. Reaves. I was in Winchester when this contract was signed. I asked Mr. Reaves whether

he wanted to put any value on the horses, and he says, 'Oh, I guess not,' and so he signed the contract. They were put down at $100. I told him it would cost more money if he put a value on them, which he knew. He said, 'All right, let it go at that.' He took the lower rate. I told him it would cost him more money if he put the value on them. Each horse was valued at $100 and the cost of a car from Winchester to Hanover would be $100. That was the rate he paid. I rode as far as York in this train. It is 17 miles from York to Hanover. When stock is shipped by express they often carry them in freight trains for short distances to make better time. They frequently send them by freight, but it is not customary. It is not customary, as a rule; but they send them by freight very often to make better time. The rate given by Adams Express Company and filed with the Interstate Commerce Commission, as shown by this certificate of the secretary of the Interstate Commerce Commission, is $1 a hundred from Winchester to Hanover. Taking car-load of horses, 10,000 pounds, makes $100."

It is a recognized principle in our system of procedure that a verdict may be interpreted and allowed significance by proper reference to the pleadings, the evidence, and the charge of the court. *Bank v. Wilson,* 168 N. C., 557; *Donnell v. Greensboro,* 164 N. C., 330.

It is also well understood with us that express companies are "agencies organized for the purpose, at a higher price, of providing greater security and dispatch in the delivery of freight," a fact that the evidence in this instance tends to support and generally of sufficient notoriety to permit and require that the Court should take judicial notice of it. *Furniture Co. v. Express Co.,* 144 N. C., pp. 639-643; *Alsop v. Express Co.,* 104 N. C., 278. And considering the record in reference to these admitted principles, we think that the breach of contract shown in this verdict establishes such a departure from the agreement, in its essential terms and purpose, as to justify the plaintiff in ignoring its provisions and suing for the entire damages.

This position that a willful and substantial deviation from the provisions of the contract of shipment will amount to an abandonment of the same for the time on the part of the carrier and justify a recovery for the entire damages notwithstanding the restrictive features as to valuation contained in the contract, is upheld in many well considered cases on the subject, and, in our opinion, fully sustains the recovery allowed in the present instance. *Frank McKahan,* 209 Mass., 470, reported also in 35 L. R. A. (n. s.), p. 1046; *Parrett v. Lehigh Valley R. R.,* 153 Pa. St., 302; *Pacific Coast v. Yukon Trans. Co.,* 153 Fed., pp. 29-36; *Swift & Co. v. Furness Wilky & Co.,* 87 Fed., 345; *R. R. v. Caldwell,* 89 Ark., 218; *R. R. v. Dunlap,* 71 Kans., 67;

*Garnett v. Jones*, 5 B. and A., 53; 106 English Reports, reprint, p. 1113; 4 R. C. L., p. 817; 6 Cyc., p. 396.

In *McKahan's case, supra*, it was held: "If a carrier forwards a car of horses by a train other than that provided for by the contract, upon which a care-taker was to accompany them, he abrogates the carriage contract, at the election of the shipper, and deprives himself of the benefit of a provision therein which fixes the value of the horses for purposes of transportation."

In *Pacific Coast v. Yukon, etc., supra*, the principle is stated by *Gilbert, J.*, as follows: "It is contended that the district court erred in holding the appellants liable for damage for the decay of perishable goods when the bills of lading provided that they should not be responsible for the decay of perishable articles or damage to any article 'arising from the effect of heat or cold, sweating, or fermentation.' The answer to this contention is that the limitations of liability expressed in the bills of lading were applicable only to the voyage contemplated in the contract. They do not relieve the carrier from liability for damages resulting from the delay occasioned by the abandonment of the voyage and the return of the vessel to Seattle. 6 Cyc., 383; *Balien & Son v. Jolly, Victoria & Co., Ltd.*, 6 T. L. R., 345; *Luduc v. Ward*, 20 Q. B. D., 475. In the latter case the Court said: 'It follows that when the defendant's ship went off the ordinary track of a voyage from Fiume to Dunkirk to a port not on the course of that voyage, such as Glasgow, there was a deviation, and she was then on a new voyage, different from the one contracted for, to which the accepted perils clause did not apply, and, therefore, the ship owner is responsible for the loss of the goods.' And in 4 Ruling Case Law it is said: 'A carrier unjustifiably deviating from the agreed or customary route or *mode* or *manner* of transportation becomes liable as insurer for loss of or injury to the shipment and cannot avail himself of any exceptions made in his behalf in the contract of agreement.' "

True, the contract of shipment as entered into between these parties was at a stipulated rate and an agreed valuation, and there is stipulation, also, "that in no event shall the express company be liable for the horses in excess of $100 value each." But where the company voluntarily and without just cause or excuse has abandoned the mode and manner of transportation contemplated and provided for by the contract, the shipper, as we have seen, is justified in treating the contract as abrogated for the time being, and for injuries received during such period and incident to such breach he may, as stated, recover for the entire damages suffered, notwithstanding the restrictions as to value; these, being but a part of the contract, are also ineffective while the carrier is acting outside of the contract and its obligations. And the

same answer will suffice, we think, for another objection insisted on by defendant, that to uphold the present recovery would be in violation of the regulations of the Interstate Commerce Commission establishing alternative rates and sanctioning a limitation of liability for the lower rate. These rates were established and approved in reference to contracts of shipment by express, and do not and were not intended to apply where the carrier had wrongfully resorted to an entirely different mode of shipment. It is true, as argued, that the decisions of the Supreme Court of the United States afford the final and controlling rule on this subject, and that they have been very insistent in enforcing the provisions of the Federal statutes designed and intended to prevent undue preferences and discriminations among shippers; but so far as examined, and in reference to the question presented on this appeal, they have only upheld these ratings and incidental valuations where the shipments were of the kind included in the contract and as to injuries inflicted while the contract was in the course of performance and where it clearly contemplated that the valuation agreed upon should form the basis of adjustment.

In *Atchison, etc., Ry. Co. v. Robinson,* 233 U. S., 173, to which we were referred by counsel, the defendant in error was insisting on the validity of an oral and special contract differing from a written bill of lading as to the shipment and in violation of the published rates of Interstate Commerce Commission applicable to that character of shipment, and it was held that the bill of lading and the rate applicable thereto should prevail. And in *Georgia, etc., Ry. v. Bush Milling Co.,* to which we were more especially referred, it was held that when the carrier had made delivery to a wrong person there was a "failure to deliver" in breach of the contract of shipment, and a claim therefor was subject to a provision of the contract requiring such claims to be presented in four months, and that the effect of such a provision could not be avoided by the shipper bringing his action in trover and thus attempting to ignore a provision of the contract applicable to and controlling as to the rights of the parties. But neither of these decisions, as we understand them, is in conflict with the position that when the carrier has, in breach of its agreement, entered upon a character of shipment entirely different from that provided for in the contract, the shipper, as to injuries inflicted during such breach, is relieved from the restrictive and all other features of the contract, and may maintain his suit for the entire injury suffered. If the salutary provisions of the statute enacted to prevent discrimination is in any way threatened by such a ruling, it could be the better preserved by allowing the carrier to deduct the shipping rate for the full value applicable to the character of shipment to which he has seen fit to resort.

The obligation that a written notice of the present claim was not made within thirty days was not urged on the argument, and, being only mentioned in the brief without discussion, under our rules, should be considered as abandoned. Vol. 164, Rule 34. *Guano Co. v. Mercantile Co.,* 168 N. C., 223.

The requirements for presentation within so short a period has been held unreasonable with us. *Phillips v. R. Co., ante,* 86 (89 S. E. Rep., 1057); *Mfg. Co. v. R. R.,* 128 N. C., 280. And, in any event, on the facts of this record, such a requirement would be regarded as having been waived, it appearing that the agents of the defendant company were fully cognizant of the injury to the mare and the attendant circumstances; the company sent a veterinary surgeon to treat her, and the division agent of the company was informed by letter of the injury and went himself to see about it, and "called around pretty nearly every day, and was anxious to see how she was getting on." *Horse Exchange v. R. R.,* 171 N. C., 65; *Mewborn v. R. R.,* 170 N. C., pp. 205-210; *Baldwin v. R. R.,* 170 N. C., 12.

We find no reason to disturb the results of the trial, and the judgment for plaintiff is affirmed.

No error.