STATE OF NORTH CAROLINA EX REL. CORPORATION COMMISSION, AND
THE SOUTHERN POWER COMPANY, PETITIONER, v. THE CANNON
MANUFACTURING COMPANY ET AL., RESPONDENTS.

(Filed 21 February, 1923.)

1. **Corporation Commission—Corporations—Rates of Charges—Tolls—Statutes.**

   Including public-service corporations furnishing its customers electricity
   for power, etc., the Corporation Commission is authorized by statute to
   fix just and reasonable rates or charges, and when these rates are so fixed,
   other or lower rates are to be deemed as unjust and unreasonable. C. S.,
   1035, 1066-7-8, 1083-90, 1097, 1100.

2. **Appeal and Error—Judgments—Fragmentary Appeals—Dismissal—Corporation Commission.**

   An appeal lies under the provision of statute, from an order of the
   Corporation Commission fixing certain rates to be charged by a public-
   service corporation to its customers for furnishing them with electrical
   power, C. S., 1097-8, to the Superior Court, where the trial will be *de novo*,
   with the presumption that the rates so fixed by the Corporation Commis-
   sion are prima facie just and reasonable, and from thence only will a
   further appeal lie to the Supreme Court, governed by the rule that it must
   not be fragmentary, but that it shall be from a final judgment or one final
   in its nature.

3. **Same—Objections and Exceptions—Procedure.**

   Where the ruling of the Superior Court does not amount to a final judg-
   ment, or one final in its nature, the remedy of the party adversely affected
   is by exception, preserving his right until such appeal may be had from a
   final judgment.

4. **Appeal and Error—Judgments—Parties—Jurisdiction—Fragmentary Appeal—Corporation Commission.**

   Where the customers of a public-service corporation are properly joined
   upon notice, and participate in the hearing before the Corporation Com-
   mission upon the question of whether the petitioning corporation should
   be allowed to raise its rates of charges for electrical power furnished them,
   on appeal to the Superior Court from the rates fixed by the commission
   as just and reasonable, the ruling as to the rates so fixed shall be regarded
   as single and entire, applying to all, and some of the users may not sepa-
   rate themselves from the others and appeal to the Supreme Court from
   an order overruling their exception for the lack of authority of the com-
   mission to make the rates, the appeal being fragmentary, and not from a
   final judgment or one in its nature final.

5. **Appeal and Error—Fragmentary Appeal—Supreme Court—Opinions—Discretion.**

   The Supreme Court may dismiss an appeal as fragmentary and express
   its opinion on the merits upon matters duly presented of record, when it
   appears that the case is one of importance and an opinion is desirable as
   a guide to the parties in the further proceedings in the case.

6. **Corporation Commission—Rates—Jurisdiction—Judgments—Orders.**

   When the Corporation Commission has finally established, under the
   provisions of the statute, rates to be charged by a public-service corpora-

2—185

tion for furnishing electrical power, the rates ·are coextensive with the State's jurisdiction and territory, and conclusively bind all corporations, companies, or persons who are parties to the suit and have been afforded an opportunity to be heard.

**7. Corporation Commission — Corporations — Rates of Charges—Police Powers—Contracts—Constitutional Law.**

The authority conferred upon the Corporation Commission to establish reasonable and just rates of charges by a public-service corporation for furnishing to its customers electrical power, come within the police powers of the State, and contracts previously made are subordinate to the public interest that such rates be reasonable and just, and afford the corporation supplying the service a safe return upon its investment, having proper regard to the public interest that plants of this character should be properly run and maintained.

**8. Same—Commerce—Statutes.**

While the generation of electricity in another State when transported to purchasers in this. State may be regarded as interstate commerce, its distribution and sale here is local to the State, permitting the Corporation Commission to establish a just and reasonable rate of charges in conformity with the statutory powers, there being no interfering act of Congress relating to the subject. C. S., 1066.

**9. Corporation Commission—Statutes—"Transportation"—Distribution—Statutes—Words and Phrases.**

The word "traffic," used in our statute to confer upon the Corporation Commission the authority to establish just and reasonable rates of charges by certain public-service corporations, includes the transportation and also the sale and distribution of the commodities affected. C. S., 1066.

**10. Corporation Commission—Corporations—Rates of Charges—Valuation of Plant—Evidence—Tax Valuation.**

Under the provisions of our valid statute, C. S., 1068, the Corporation Commission, in fixing a reasonable and just rate of charges for public-service corporations, may make a fair estimated value of the property presently used, and in relation thereto consider the tax valuation of the plant: *Held*, under the facts of this case, an exception was untenable that the rate fixed was upon the basis of the tax valuation alone.

**11. Corporation Commission — Rates of Charges — Orders—Judgments—Maximum and Minimum Rates.**

Upon the principle that a finding of fact should be determined according to the law and evidence in the case, *it is held* herein that the word "maximum," used in the order of the Corporation Commission for fixing the rates of charges allowed to the petitioning public-service corporation, was not intended to mean that a descending rate therefrom was to be allowed under the contract set up by the customers or users, but to distinguish it from the word "minimum," which also was used in reference to the subject.

**12. Corporation Commission—Findings—Judgments—Orders—Just Rates—Inferences—Unjust Rates.**

Under our legislation pertinent and the facts presented by the record on this appeal, the finding by the Corporation Commission that the rates

designated by it are reasonable and just, includes a finding that all other rates are unreasonable and unjust.

CLARK, C. J., concurring; WALKER, J., did not sit in this case and took no part in the decision thereof.

APPEAL by respondents from *Bryson, J.,* at July Special Term, 1922, of CLEVELAND.

This is a petition filed by the Southern Power Company, petitioner, before the Corporation Commission, in November, 1920, for an increase of rates on electric power supplied by petitioner to its customers within the State, and on the alleged ground that the existent rates were insufficient to afford petitioner a reasonable return on a fair value of the property used in the generation, sale, and distribution of such electricity, and to enable the petitioners to supply and furnish efficient and adequate service to the members of the consuming public "demanding service from petitioner." The rate suggested as necessary being at 1.4 cents per kilowatt hour to an amount of 50,000 kilowatt hours per month for primary power, with a larger scale where a less amount of such power is taken, and a diminishing scale of prices where the quantity is greater. There was also a fixed sum requested for secondary at one cent per kilowatt hour for first 50,000 kilowatt hours per month, with an increasing and diminishing scale for smaller and larger quantities.

On the filing of the petition, the commission caused notices to be issued and served on all the customers of the petitioner within the State having contracts with the company for electric power, and also a copy of the petition filed by said company, the number of such customers being about 280. Of these customers some eighty or more appeared and objected to the proposed increase, and thirty or forty filed answers stating their objections in general terms, and setting forth, also, long-term contracts held by them with petitioner in which said company had contracted and agreed to supply the holders with electric power at rates greatly less than those proposed in the petition, both for primary and secondary power.

The commission held a full investigation of the case, the different hearings extending from November, 1920, to July, 1921, and during such proceedings it appears that both petitioners and respondents were represented by counsel, and all evidence relevant to the inquiry was duly considered, including the contracts set out and relied upon by respondents in bar of the proposed increase, this last position appearing not only from the presumption of correct findings on the part of the commission as expressly provided in the statute, but from a proper perusal of the record, which will disclose that these contracts set up by respondents were nowhere challenged or denied by the petitioner, and were discussed and treated throughout as being in evidence and relevant to the questions at issue in the cause.

At the close of the hearing, and after due consideration, the commission, on 8 July, 1921, entered their formal order, appearing in the record, and to be taken as part of this statement, in which they fixed and declared as reasonable and just rates to be charged by petitioner for electricity 1.25 cents per kilowatt hour for primary power for amount of 50,000 kilowatt hours per month, with an increasing or diminishing charge for less or greater amounts per month. And they, also, as shown in their order, fixed the reasonable and just charge for secondary power at one cent per kilowatt hour for 50,000 kilowatt hours per month, with an increasing and diminishing charge for a less or greater quantity, the amount so fixed upon being as shown, less than that asked for by petitioners, but greater than the amount agreed upon in the contracts set up and in part relied upon by the respondents.

On the filing of this order a large number of respondents acquiesced in the findings of the commission and determined to make no further protest against the rates fixed upon. Appeals to the Superior Court being taken by 23 or more of the respondents, constituting three groups of mills holding long-time contracts, and which may be designated as the Cannon group, the Johnston group, and the Cone group, this last consisting of the Proximity Manufacturing Company, the Belle View Manufacturing Company, and the Revolution Cotton Mills, and being the appellants in No. 480, said appeal was transferred for hearing to the Superior Court of Cleveland County, where at July Special Term, 1922, it was submitted and heard before Bryson, J., and a jury, on the following issue:

"Were the rates fixed and set forth in the several schedules contained in the order of the State Corporation Commission of 8 July, 1921, unjust and unreasonable to the consumers of such power and current?"

At or before the impaneling of the jury, the Cone group of mills, admitting that the rates fixed by the commission were reasonable and just, withdrew all exceptions to the issues and findings of fact, and moved to dismiss the appeal and proceedings for that the Corporation Commission was without jurisdiction or power in the premises:

1. Because this attempted regulation affected and concerned interstate commerce, and in such form and fashion that Congress alone could deal with it.

2. That our own statute, constituting the commission, restricted its powers of rate regulation to "intrastate traffic," and did not extend, therefore, to the rates in question here, as same, according to their position, concerned only "interstate commerce."

The motion was overruled, and this group of respondents excepted.

The Cannon group and the Johnston group, while joining in the motion to dismiss because the subject-matter was interstate commerce, insisted on their exceptions of fact, and introduced their evidence on the

issue, and same was submitted to the jury under a clear and comprehensive charge of the court. While the jury were considering of their verdict, counsel for these two groups moved further that the order of the commission be set aside and the proceedings be remanded with instructions, for errors of law apparent on the face of the record:

1. That on the admitted facts, and as a conclusion of law, the rates fixed by the commission would bring about an unlawful discrimination in favor of the holders of certain contracts for power at a lower rate existent in the State of South Carolina.

2. For errors in the basic principles of valuation under which the rates fixed upon were estimated.

These motions were disallowed, and respondents excepted.

The jury having failed to agree upon a verdict, a juror was withdrawn and a mistrial had, and the issue is now on the Superior Court docket undetermined. The Cone group of mills appealed to Supreme Court from the refusal of his Honor to allow their motion to dismiss for lack of jurisdiction, and his declining to sign a separate judgment to that effect, the court being of opinion that a separate right of appeal did not arise to these appellants. The Cannon group and Johnston group took an appeal from the order overruling their motion to dismiss and their motion to set aside the order of the commission and remand, with instructions, as heretofore stated.

The record further discloses that at the call of the cause for trial in the Superior Court, the Attorney-General, in behalf of the Corporation Commission, having obtained leave for the purpose, moved to dismiss the appeal of the respondents for that no right of appeal existed for any of the respondents on the facts presented. Motion was overruled, and the Attorney-General excepted.

The appeals of the respondents, appearing on the docket as two cases, were consolidated by consent, and argued, considered, and determined as one, presenting, however, the different interests of the parties as disclosed in the record.

On the hearing in this Court, there was motion by the power company, the petitioner, to dismiss the appeals as being fragmentary and premature.

*E. T. Cansler, John M. Robinson, C. R. Hoey, O. Max Gardner, and W. S. O'B. Robinson, Jr., for Southern Power Company, petitioner.*

*Tillett & Guthrie, J. C. Biggs, A. G. Mangum, A. C. Jones, O. M. Mull, and D. Z. Newton for the Cannon Manufacturing Company et al.*

*R. R. King, S. M. Gattis and Parker & Long for the Cone group of mills.*

HOKE, J., after making the preliminary statement: Our legislation more directly pertinent to this controversy, C. S., ch. 21, secs. 1035,

1066-67-68, 1083-1090, 1097-1098-1100 *et seq.,* confers upon the Corporation Commission power to make reasonable and just rates and charges to prevail as to intrastate traffic by certain designated public-service companies, including those engaged in furnishing electricity, electric-light current, power or gas, etc. The statute, more particularly in section 1066, considered in connection with sections 1083 and 1090 *et seq.,* clearly contemplates and provides that the exercise of this power in a given case shall be made upon notice and due inquiry, and in section 1067 it is declared: "That the rates or charges established by the commission shall be deemed just and reasonable, and any rate or charge made by any corporation, company, copartnership, or individual engaged in the business above specified, other than those so established, shall be deemed unjust and unreasonable." Section 1068 gives indication as to the method and basis of valuation to be recognized in fixing these rates, and in sections 1097-1098 provision is made for reviewing the action of the commission by appeal to the Superior Court, and in section 1100 the right of appeal is given to the Supreme Court from "the judgment of the Superior Court under the same rules and regulations as are prescribed by law for appeals, etc."

It has been heretofore recognized with us that the Southern Power Company, the petitioner, comes within the provisions of the law, *Public Service Co. v. Power Co.,* 179 N. C., 30; *Public Service Co. v. Power Co.,* 179 N. C., 330, and that the powers conferred by the statute extend in proper instances both to an increase and lowering of rates as the facts may appear, the position being stated in 179 N. C., 151-161; *In re Utilities Co.,* as follows: "Both from the language of the statute and its evident meaning and purpose, this power to fix rates that are just and reasonable extends to an increase as well as a lowering of rates, and in making a decision on these questions it is clearly contemplated and provided that the commission shall establish such rates and charges as will give to the owners a fair return on their investment and enable them to keep their property and equipment in condition to afford adequate, safe, and convenient service."

And in reference to the sections providing for and regulating appeals, our decisions hold that no appeal lies from the orders and rulings of the commission directly to the Supreme Court, but that any such appeal must be taken in the first instance to the Superior Court, and only from the judgments of the Superior Court will an appeal lie to this Court under the same rules and regulations as are prescribed by the general law appertaining to appeals. And that when such appeal is taken from the action of the commission on the controlling and determinative issue in the cause, the trial is to be *de novo,* a ruling fully recognized by the appellants in the present case, the record disclosing that in lodging their

appeal a trial *de novo* is demanded. Record, p. 1155; *Corporation Commission v. R. R.,* 137 N. C., 1; *Rhyne v. Lipscombe,* 122 N. C., 650; *Pate v. R. R.,* 122 N. C., 877; *S. v. R. R.,* 161 N. C., 270.

From this it follows that on appeal the decisions and rulings of the commission on the hearing are in no way controlling, and the judge, at the trial of the cause in the Superior Court, must submit the same to the jury under recognized and approved principles of law. It will be noted, also, that the statute as to appeals to this Court provides, as stated, "That such appeals may be taken from the judgment of the Superior Court under the same rules and regulations as prescribed by the general law." And it is the accepted principle controlling appeals under the general law that except when otherwise expressly provided by statute, they are only permissible from a final judgment, or one in its nature final. C. S., 638; *Cement Co. v. Phillips,* 182 N. C., 437; *Duffy v. Hartsfield,* 180 N. C., 151; *Barbee v. Penny,* 174 N. C., 571; *Gilbert v. Shingle Co.,* 167 N. C., 286; *Chadwick v. R. R.,* 161 N. C., 209; *School Trustees v. Hinton,* 156 N. C., 586; *Smith v. Miller,* 155 N. C., 242; *Pritchard v. Spring Co.,* 151 N. C., 249; *Cameron v. Bennett,* 110 N. C., 277. A ruling that prevails with us, even on a motion to dismiss for want of jurisdiction, where such motion is disallowed, the proper practice being to note an exception and proceed with the trial of the cause. Nor is the position affected because three of the respondents, referred to as the Cone group, and in like case with the others, have seen proper to admit that the rates established by the commission are reasonable and just, and seek to appeal from a refusal of the court to dismiss the proceedings for lack of jurisdiction or power in the commission to hear and determine the same.

This power to fix rates that are reasonable and just for public-service companies is conferred in the exercise of the police powers of the State. Having taken from these companies, or essentially modified their right of private contract, it is altogether just and proper that they should have such rates and charges fixed as will yield them, as stated, a fair return on their investment, and a sound public policy demands that the rates and charges should also enable them to keep their property and equipment, which they are held to have dedicated in part to public use, in a condition to afford adequate, safe, and convenient service. When properly established according to the statutory provisions, and after notice and due inquiry, they are coextensive with the State's jurisdiction and territory, and conclusively bind all companies, corporations, or persons who, being parties, have been afforded an opportunity to be heard, and are prima facie reasonable and just in all other cases coming within the scope and purview of the inquiry and findings, and it has been directly held that private contracts for a lower rate, though already

existent, be to this extent subordinated to the public weal. *In re Utilities Co.,* 179 N. C., 151-161, citing, among other cases, *The Union Dry Goods Co. v. Public Service Corporation,* 248 U. S., 372.

Speaking to the position, and the underlying reasons for it, the Court, in the case referred to, said: "Not only is the judgment of his Honor sustained by the principle more directly involved, but any other ruling in its practical application would likely and almost necessarily offend against the principle which forbids discrimination on the part of these companies towards patrons in like condition and circumstance. If a *quasi*-public company of this kind could evade or escape regulation establishing fixed rates that are found to be reasonable and just by making long-time contracts or other, this regulation might be made to operate in furtherance of the very evil it is in part designed to prevent."

The issue now pending in the Superior Court, involving as it does whether the rates established by the commission shall prevail for companies of this character, must be regarded as single, entire, and inclusive, and three of twenty-four or twenty-five respondents may not sever themselves from its effects and presently prosecute their appeal. If this were allowed and they fail in establishing their motion to dismiss, they could still have the benefits of the ultimate finding of the jury in the cause, in case the rates fixed by the commission are set aside. It appearing, therefore, that no final judgment of the Superior Court affecting the rights of these parties has been entered, and no such judgment can be so entered while this, the controlling issue, is pending and undetermined, their appeals, like the others, must be dismissed as fragmentary and premature.

There could be no better illustration of the wisdom of the rule disallowing fragmentary appeals than the instant case, where there are at least 274 persons and companies notified, and with the right to be heard, and seventy or eighty appeared. If three could sever their case from the dominant issue, others could do the like, and, as said in *Pritchard's case, supra,* "Each claimant considering himself aggrieved could bring his cause here for consideration, litigation of this character would be indefinitely prolonged, costs unduly enhanced, and the seemly and proper disposition of causes prevented."

While under our established rules of orderly procedure we must hold that these appeals be dismissed, we consider it proper to express our opinion on some of the principal exceptions appearing in the record, a course also approved by our decisions where the case is one of importance and an opinion is desirable as a guide to the parties in the further proceedings in the cause. *Cement Co. v. Phillips,* 182 N. C., 437; *Gilbert v. Shingle Co.,* 167 N. C., 286; *S. v. Wylde,* 110 N. C., 500; *Milling Co. v. Finlay,* 110 N. C., 411.

CORPORATION COM. *v.* MFG. CO.

And first, on the motion to dismiss because the subject-matter of these rate regulations is interstate commerce, and both under the provisions of the Federal Constitution and the state statute under which the commission acted the same is not the subject of state regulation.    While the transportation and sale of electric energy generated in one state and conveyed directly to purchasers in another is undoubtedly interstate commerce, which may be neither prohibited nor taxed, nor substantially burdened or interfered with by State regulations, as we understand the record, it is the permissible inference that 70 per cent of the power sold to consumers in this State is generated in South Carolina and brought into this State over the transmission lines of the company at a high tension of 80,000 or 100,000 volts, that mingled here with the other 30 per cent of this power, which last is generated in North Carolina, the entire amount at various substations here is "stepped down" or reduced to a commercial voltage and then sold to the consumers from the principal office of the company in the city of Charlotte, N. C., or at the homing place of the consumers in this State.    From this statement, which, in our opinion, sufficiently appears from different portions of the record, both the product and the contracts concerning them being situate in this State, it would seem that the subject-matter of the controversy is strictly intrastate, and may not be subjected to Federal control or interference.    But it is not now required to make definite ruling on this question, for on the facts as here presented Congress thus far has made no interfering regulations as to the transmission and sale of electricity between the states, and the authorities are at one in holding that though electric power or natural gas may be transported from one state to another, and though interstate commerce may be so far involved in its local sale and distribution that Congress could exert control to the extent required to prevent such commerce from being unduly burdened, in the absence of such action on the part of Congress the local sale and distribution of these products within the several states may be subjected to state regulation in the reasonable exercise of the police power.    *Pennsylvania Gas Co. v. Public Service Co.,* 252 U. S., 23; *Public Utilities Co. v. Landon,* 249 U. S., 236; *In re Pa. Gas Co.,* 225 N. Y., 397; *The Minnesota Rate Cases,* 230 U. S., 352-402; *Robbins v. Shelby Tax District,* 120 U. S., 489-492; *Mill Creek Coal & Coke Co. v. Public Service Co.,* 84 West Va., 662; *Mfrs. Light and Heat Co. v. Ott,* 215 Fed., 940.

In the *Minnesota Rate Case, supra,* a case involving the right of intrastate railroad rate regulation, *Associate Justice Hughes* states the position as follows:  "But within these limitations there necessarily remains to the states, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction

although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending Federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which, nevertheless, with the acquiescence of Congress, have been controlled by state legislation from the foundation of the Government because of the necessity that they should not remain unregulated, and that their regulation should be adapted to varying local exigencies; hence, the absence of regulation by Congress in such matters has not imported that there should be no restriction, but rather that the states should continue to supply the needed rules until Congress should decide to supersede them. Further, it is competent for a state to govern its internal commerce, to provide local improvements, to create and regulate local facilities, to adopt protective measures of a reasonable character in the interest of the health, safety, morals, and welfare of its people, although interstate commerce may incidentally or indirectly be involved."

In *Pa. Gas Co. v. Public Service Co., supra,* a case involving the right of State regulation of the sale and distribution of natural gas, transported by pipe lines from the State of Pennsylvania into the State of New York, *Associate Justice Day,* in the opinion of the Court upholding the right, said: "The thing which the State Commission has undertaken to regulate, while part of an interstate transmission, is local in its nature, and pertains to the furnishing of natural gas to local consumers within the city of Jamestown, in the State of New York. . . . This local service is not of that character which requires general and uniform regulation of rates by congressional action, and which has always been held beyond the power of the states, although Congress has not legislated upon the subject. While the manner in which the business is conducted is part of interstate commerce, its regulation in the distribution of gas to the local consumers is required in the public interest, and has not been attempted under the superior authority of Congress."

This opinion is in affirmance of a like decision of the same case by the Court of Appeals of New York, and in which *Associate Justice Cardoza* said in part: "We deal here with a different situation. There is here no regulation of transportation. *Mfrs. Light and Heat Co. v. Ott,* 215 Fed., 940, 944. There is no regulation of a duty owing equally to two states. There is regulation of a duty owing to one of them alone. The seller of most things has the right to sell at whatever price he will. This petitioner has lost that right by the acceptance of a public franchise in consideration of a public service. *Gibbs v. Baltimore Gas Co., supra; New Orleans Gas Co. v. Louisiana Light Co.,* 115 U. S., 650; 6 Sup. Ct., 252; 29 L. Ed., 516; *Shepard v. Milwaukee Gas Co.,* 6 Wis., 539; 70

Am. Dec., 479. The service is due to the state from which the privilege proceeds. Until Congress shall intervene, it is therefore the police power of New York that controls the sale of gas to consumers in New York. There is no division of the power between New York and Pennsylvania. There is no more a division of power than when we regulate our fees for wharfage or our tolls for artificial waterways. In these matters, protection of our own inhabitants is a duty that is ours and no one else's. The power may be displaced; but, until displaced, it is undivided. Here, then, is the decisive distinction between the regulation of the price of gas and that of rates of transportation. There is no room for conflict of authority, for clashing regulations. The statute has a sphere of operation that is not national, but local. *Cooley v. Bd. of Port Wardens, supra.* It is idle to speak of the need of uniformity of action by states of equal competence when there is only one state whose action is involved. But even within the state, diversity rather than uniformity is exacted by the conditions of the business. Rates adequate in one city are inadequate in another. The local needs are best known to local agencies of government. No central authority, acting for the Nation as a whole, will readily discern them.

"The case comes, then, to this: We have a sale of a single commodity. We have a preëxisting duty to sell it at fair rates. We have a transaction where conflicting regulations by the states are impossible, for the public duties regulated are fulfilled in one state only. We have a statute which declares a duty that would exist without it, and establishes a new agency of government to insure obedience. The silence of Congress cannot be interpreted as a declaration that public-service corporations, serving the needs of the locality, may charge anything they please. *County of Mobile v. Kimball, supra; Transportation Co. v. Parkersburg, supra; Covington Bridge Case, supra,* 154 U. S., 222; 14 Sup. Ct., 1087; 38 L. Ed., 962. The local regulation stands until Congress occupies the field."

In *Mill Creek Coal and Coke Co. v. Public Service Commission, supra,* determining the right of state regulation of sale and distribution of electric energy in the State of West Virginia, transmitted from the State of Virginia, *Associate Justice Lynch* said: "But though interstate commerce is involved, the state is not necessarily deprived of the right to regulate and supervise under its police power. That which is attempted here is the regulation of the rates at which electric power, produced in Virginia, shall be sold in West Virginia. It is settled law that the police power of the state embraces regulations designed to promote the public convenience or the general welfare or prosperity, as well as those in the interest of the public health, morals, and safety. *Lake Shore and M. S. R. Co. v. Ohio,* 173 U. S., 285, 292; 43 L. Ed.,

702, 704; 19 Sup. Ct. Rep., 465; *Chicago, B. and Q. R. Co. v. Illinois,* 200 U. S., 561, 562; 50 L. Ed., 596, 609; 26 Sup. Ct. Rep., 341; 4 Ann. Cas., 1175; *Bacon v. Walker,* 204 U. S., 311, 317; 51 L. Ed., 499, 502; 27 Sup. Ct. Rep., 289; *Chicago and A. R. Co. v. Transbarger,* 238 U. S., 67, 77; 59 L. Ed., 1204, 1211; 35 Sup. Ct. Rep., 678.   And it is clear that the regulation of the rates of public utilities is for the public convenience and general welfare, and hence a proper exercise of the police power of the State.   *Benwood v. Public Service Commission,* 75 W. Va., 127; L. R. A., 1915 C, 261; 83 S. E., 295; *Virginia-Western Power Co. v. Com.,* ...... Va., ......; A. L. R.; P. U. R., 1919 E, 766; 99 S. E., 723. See, also, *German Alliance Ins. Co. v. Lewis,* 233 U. S., 389; 58 L. Ed., 1011; L. R. A., 1915 C, 1189; 34 Sup. Ct. Rep., 612."

"In fixing the rate of sale, however, as distinguished from rates of transportation, the duty regulated is of an entirely different nature. The duty of the power company to sell at reasonable rates was one owed both to citizens of Virginia and to the public in this state.  But the two duties do not overlap, as they do where rates of transportation are concerned.   The price at which a commodity is sold is essentially local, affecting chiefly those in the community where it is made, and only incidentally, if at all, touching those outside of the community."

And in *Mfrs. Light and Heat Co. v. Ott,* 215 Fed., *supra, Judge Woods* said: "But this interflow of gas from one state to another, according to the pressure from the main gas pipes as common reservoirs, cannot affect the power of the State of West Virginia to make reasonable regulations as to rates for gas furnished to its own citizens.   *West v. Kansas Gas Co.,* 221 U. S., 229; 31 Sup. Ct., 564; 55 L. Ed., 716; 35 L. R. A. (N. S.), 1193, relied on by complainants, has no application, for in the present case no effort is made to prevent the transportation and sale of natural gas from West Virginia into other states.  It is not necessary to decide whether the Congress may not regulate charges for natural gas under such conditions, and under the well known rule the Court should not anticipate that question.   In the present state of the law, the Congress having taken no action, it was clearly within the power of the state legislature to provide for the protection of its own citizens against excessive charges.   If it be assumed that interstate commerce will be incidentally affected, yet the regulation of the local charges of a natural gas company as a public-service corporation is within the police power of the state until the Congress sees fit to act."

From a proper consideration of these citations and the principles they approve and illustrate, it appears that the sale and distribution of electric power within a given state is a matter that primarily concerns the internal affairs of such state, and though it may become the subject of Federal regulation in so far as interstate commerce is involved and

to the extent required for its protection, its sale and distribution is local in its character and comes clearly within our State statute, C. S., 1066, conferring upon the State Corporation Commission the power to make reasonable and just rates and charges for "intrastate traffic," the term "traffic" being broad enough to include both transportation as well as sale and distribution, and it is clearly in the last sense that the term is used in the statute as applied to "persons, companies, or corporations furnishing electricity." Neither in the commerce clause of the Federal Constitution, therefore, nor in the State statute, can there be found any valid objection to the power of the State Corporation Commission to deal with this subject, and the exception to that effect has been properly overruled.

Appellants except further that to uphold the rates as established by the commission would work an unlawful discrimination against the consumers of electric power in this State, and it is moved, among other things, to set aside the rates and remand with instructions to establish rates as low as any enforceable contract voluntarily made by the petitioning company, the position being that certain existent contracts in the State of South Carolina and enforceable there are much lower than those fixed upon here. We do not think that a proper consideration of the record will disclose that any unlawful discrimination of a substantial kind and amount would necessarily and as a conclusion of law result by reason of the South Carolina contracts referred to. There is evidence to the effect that the apparent difference in prices in the great bulk of the South Carolina contracts is because the mills in that State, as units, are much larger consumers of power than here, and can, therefore, and on that account, purchase the current at a lesser rate, and otherwise we do not discover in the record any evidence that a contract in South Carolina at a lower rate, voluntarily made by the power company, is in like condition and circumstance with those in this State, and which are the subject-matter of these regulations. Apart from this, however, the Corporation Commission in this State is empowered and directed to make reasonable and just rates as applied to the distribution and sale of power in this State and not otherwise, and such power cannot be directly controlled or weakened by conditions existent in other states, either from the action or nonaction of official bodies there, or the dealings between private parties. To hold otherwise would, in its practical operation, be to withdraw or nullify the powers that the statute professes to confer and should not for a moment be entertained. Nor is the position approved by any well considered authority. *Port Richmond & Bergen Point Ferry Co. v. Board of Chosen Freeholders,* 234 U. S., 317; *Hudson County v. State,* 24 N. J. L., 718; *In re Pa. Gas Co.,* 225 N. Y., 397; *In re Atchinson T. S. F. R. Co.,* Public Re., 1918 A, 843; *In re Ashton*

*et al. v. Potter Gas Co.,* 1922 B, 542; *In re Ga. R. R. v. Power Co.,* 1921 A, 165; *Stark Co. v. Public Utilities Commission,* 131 N. E., 157.

Doubtless if it should be made to appear that a power company or manufacturer and seller of electricity in an adjoining or other competitive state is presently and voluntarily making contracts at a substantially lower rate than here, our Corporation Commission, in the proper discharge of its duties, could well decide that such conditions might fully justify it in establishing such contract rates "as reasonable and just," but no such facts are presented in this record. On the contrary, the evidence is to the effect that, while there are some older contracts existent in South Carolina at a lower rate, made at a time when the value of this power was not known or fully appreciated by consumers, and when the company was endeavoring to introduce the power and had not itself ascertained a fair basis or rate of charge, no contracts were now being made at any such rates; but, on the contrary, all contracts of recent date are at or near the rates fixed upon in this State to consumers in like condition and circumstance. From the facts appearing in this record, the danger of unlawful discrimination does not lie in some old contracts in South Carolina indefinitely referred to and described as having been made at the inception of this business, but in the numerous contracts now existent in favor of these appellants, and which, if allowed to continue in spite of the action of the commission establishing just and reasonable rates for all purchasers of power in like condition and circumstance will assuredly work a discrimination in their favor of the most far reaching and injurious kind. As said in the *Public Utilities Co. case,* 179 N. C., at p. 161: "If a *quasi*-public company of this kind could evade or escape regulations establishing fixed rates that are found to be reasonable and just by making long-time contracts or other, this regulation would be made to operate in furtherance of the very evil it is in part designed to prevent." The exception has been properly overruled.

Again exception appears to the methods and basis of valuation adopted by the commission for the rates as fixed upon. Under this exception appellants object that the commission has considered the tax values of the company's properties or made the same the basis of their estimate. If they had done this there would seem to have come no harm to appellants, for it is near the same rate as that fixed upon or lower, but the complete answer to this objection is that, as we understand the record, the commission did not make the tax value the basis of their rates and the exception on that ground is untenable.

It is further objected that the commission, as a part of their estimate, heard evidence as to the value of petitioner's business as a "going concern." If the commission had done this it would seem to be a correct

'ruling for rate-making purposes, or, in any event, the evidence is perti-
nent and proper in determining such rate, though it has been disapproved
on the question of whether a given rate is confiscatory, *Galveston Electric
Co. v. City of Galveston,* U. S. Supreme Court Advance Opinions, No.
13, p. 382, but the objection is without support as a matter of fact, for
the record shows, as we recall it, that while evidence was heard by the
commission as to the "going concern value," it declined or failed to
allow any such value for the reason that the pertinent facts offered did
not afford any reliable or sufficient data for estimating the value.   From
a perusal of the record, the commission, in adopting a basic value for
rate-making purposes, have clearly followed the directions of the State
statute under which they were acting, C. S., 1068, to wit, a fair estimate
and valuation of the property presently used in generating and supplying
the current sold to consumers, and to be ascertained under the provisions
of the statute, as follows:

*"How Maximum Rates Fixed.* In fixing any maximum rate or charge,
or tariff of rates or charges for any common carrier, person, or corpora-
tion subject to the provisions of this chapter, the commission shall take
into consideration, if proved, or may require proof of, the value of the
property of such carrier, person, or corporation used for the public in
the consideration of such rate or charge, or the fair value of the service
rendered in determining the value of the property so being used for the
convenience of the public.   It shall furthermore consider the original
cost of the construction thereof and the amount expended in permanent
improvements thereon, and the present compared with the original cost
of construction of all its property within the State; the probable earning
capacity of such property under the particular rates proposed and the
sum required, to meet the operating expenses of such carrier, person, or
corporation, and all other facts that will enable them to determine what
are reasonable and just rates, charges, and tariffs."

The statute, in our opinion, and as applied by the commission, is in
substantial compliance with the basis and methods of estimate for rate-
making purposes upheld in the decisions of the Supreme Court of the
United States for interstate commerce.   Such rule has been set forth in
*Smyth v. Ames,* 169 U. S., 466-468, as follows:

"The basis of all calculations as to the reasonableness of rates to be
charged by a corporation maintaining a highway under legislative sanc-
tion must be the fair value of the property being used by it for the
convenience of the public; and in order to ascertain that value, the
original cost of construction, the amount expended in permanent improve-
ments, the amount and market value of its bonds and stock, the present
as compared with the original cost of construction, the probable earning
capacity of the property under particular rates prescribed by statute,

and the sum required to meet operating expenses, are all matters for' consideration, and are to be given such weight as may be just' and right in each case. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience; and, on the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

A principle of valuation approved in the *Minnesota Rate Cases,* 230 U. S., 352-434; *San Diego Land and Town Co. v. National City,* 174 U. S., 739, and other authoritative cases on the subject. We find, there-fore, no valid legal objection to the basis of valuation adopted by the commission, and this exception, also, was properly overruled.

On the argument we were cited by counsel for appellants to the recent decision of the Supreme Court of the United States, *Wichita R. R. and Light Co. v. Public Utilities Commission of the State of Kansas,* as authority against the validity of the proceedings below. Vol. 43, Supreme Court Reporter, No. 3, p. 51, 15 December, 1922. In that case it appeared, among other things, that: "The Wichita Railroad and Light Company, a corporation of West Virginia, is an electric street railroad and light-furnishing company, doing business in Wichita, Kan., and will be known as the Wichita Company. The Kansas Gas and Electric Company, also a West Virginia corporation, and to be known as the Kansas Company, is engaged in the business of furnishing electrical light and power to consumers in Kansas. In 1910 the two companies made a contract by which the Kansas Company agreed to furnish, and the Wichita Company agreed to accept and pay for, electrical energy at certain rates until 1930, and the contract was fulfilled by both until 1918."

The Kansas Company thereupon filed a petition for an increase of rates on the alleged ground that under existent conditions and prices, such increase was required to afford a fair return on their investment, and to enable them to afford adequate service, etc. The increase was allowed after a hearing, but without notice to the Wichita Company, or, so far as appears, to any others in like case. The Kansas Commission threatening to put in force the increased rates allowed by it, the Wichita Company filed a bill in equity in the District Court of the United States against the Utilities Commission to restrain the proposed action, in which suit the Kansas Company became a party. The District Court gave judgment for the Wichita Company on the pleadings and enjoined the commission and Kansas Company as prayed. The Circuit Court of Appeals reversed the action of the District Court and directed a dismissal of the bill, and the Wichita Company appealed. In reversing the judg-ment of the Circuit Court of Appeals and affirming that of the District

Court, the opinion of the Supreme Court of the United States was made to rest on the ground that there had been no finding by the commission as required by the state statute, and after notice and due inquiry that the contract rate was unreasonable and unjust, and therefore the action of the commission was void on its face and should be so considered and dealt with. In our view, this decision gives no support to appellant's position on the facts of this record, for here it appears that there was notice and full inquiry into all the facts pertinent to the inquiry, including the contracts for lower rates held by the respondents, and our statute, as we have seen, unlike that in Kansas (C. S., 1067), provides in express terms: "That the rates and charges established by the commission shall be deemed just and reasonable, and any rate or charge made by any corporation, company, copartnership, or individual engaged in the business enumerated other than those established shall be deemed unreasonable and unjust."

It is the accepted principle here that a verdict or finding of fact shall be interpreted according to the evidence and the law applicable, *Reynolds v. Express Co.*, 172 N. C., 487, and the significance of this finding that the specified rates as adopted as the reasonable maximum rate to be charged from and after 1 August, 1921 (Record, p. 1014), construed in reference to the statutory provision, amounts to a finding that any lower rates, by contract or other, are unreasonable and unjust. It may be noted, also, that the term maximum is not intended to mean that there is a descending scale of rates subject to contract, but the same is no doubt used as distinguished from the term "minimum," also used in the report to designate the lowest amount of power the consumer may use and pay for under his contract.

Nor can the motion of the Attorney-General to dismiss the appeal be allowed, such motion being insisted on because no right of appeal arose to respondents. The statute is very broad in its terms, giving an appeal "from all decisions or determinations of the commission to any party affected by the order." This should undoubtedly be held to extend to any person made a party whose pecuniary or proprietary interests are adversely affected. The question has been directly resolved against the position in *In re Utilities Co.*, 179 N. C., 151.

For the reasons heretofore stated, the appeal of the respondents is dismissed as being fragmentary and premature, and the parties will proceed with the hearing of the issue as they may be advised.

Appeal dismissed.

WALKER, J., did not sit in this case, and took no part in the decision thereof.

CLARK, C. J., concurring: When it was laid down by the Supreme Court of the United States in the *"Slaughter House Cases,"* and cases

based thereon, that the states had the fullest right to supervise the operation of corporations and regulate their rates, charges, and conduct, it made a great change in the conception of the powers of the Government and the subordination of corporations to control. The case now before the Court is second in importance probably to none that has come before us, for it recognizes to the fullest extent the power and the duty of the State to regulate and control the conduct and the charges of water-power companies as fully as this has been applied to railroad companies and others. In some respects it is even, if possible, more important to regulate the charges of these companies and their conduct than that of the railroad companies or any others.

In view of the fact that the coal mines will be exhausted in comparatively a few years, it is of the utmost importance that the powers and rights and the extent of the Government control of substitutes for coal power shall be fully and explicitly stated.

1. If this were not done, it would be in the power of great corporations of this kind, by consolidation or joint action, to engross the entire supply of electricity derived from water power, and by discrimination in rates, absorb and take over the entire cotton-mill industry, and, indeed, ultimately, all the railroads and all other industrial plants.

2. Already it has come to universal knowledge that water-power companies, exercising in lieu and in the stead of the sovereign the power of eminent domain, are taking possession of the homes, the fields, and the ancestral holdings of the people along the rivers and creeks and the valleys at will for impounding water thereon for their own purposes. If this can be done without limit, they will possess a power greater than any king, and will arouse by arbitrary action an intensity of feeling which this country has not yet seen. It is absolutely necessary that the full power of the State and the Government be exercised so that the condemnation for these purposes by gigantic combinations of wealth shall not be arbitrary, and that the humblest owner of a home shall not be evicted in any case because he is unable to cope with the ruthless power of unlimited wealth. Already in California and South Dakota the limitation set is that the State is, and must continue to be, the sole owner of all water power, the operation of which to be not only under the regulation but under lease from the State.

3. A further consideration is that with the steadily growing demand of the Federal Government and of the State for greater revenues, and that in this State by the elimination by statute of the *ad valorem* tax on the money "invested in stocks and bonds" which the Constitution requires, Const., Art. V, sec. 3, and the impossibility of deriving more revenue from an *ad valorem* tax upon other property already so heavily burdened, it is absolutely necessary that there shall be new sources of revenue.

In a recent unanimous decision by the United States Supreme Court in *Heisler v. Colliery Co.,* filed 27 November, 1922, it was held that the Pennsylvania statute was constitutional which laid a tax of 1½ per cent on the value of all anthracite coal at the mine ready for shipment.

In Alabama there is a tonnage tax of 2 cents a ton on coal.

In Louisiana there is a "severance" tax of 2 per cent on the value of all timbers cut and minerals mined, from which the state derives two million dollars yearly.

In Minnesota there is an "occupation" tax of 6 per cent on the value of all ores mined which bring into the state treasury about two millions a year.

In Texas there is a "gross production" tax of 1½ per cent on all petroleum produced, which yields that state about five million a year.

In Oklahoma there is a "gross production" tax of one-half of one per cent on ores and three per cent on oil and gas, which brings into the treasury of that state eight million dollars a year. All the above forms of taxation are validated by the decision in the *Heisler case, supra.*

These taxes go far to assert that the coal and oil which are placed in the ground by Nature are not susceptible of private ownership except by public forbearance, and that in fact they are the property of the whole people, operated in private hands upon a small rent in the nature of a tax. But at any rate the assertion of this power over them opens up a new source of revenue to the state which can thus be drawn from the same source from which so many gigantic fortunes have been built— vast sums which might have gone into the public treasuries. The tax now laid on these indicate that the extent of the control of these properties and public utilities rests with the public and not with those who exploit these vast sources of revenue.

For a greater and a stronger reason, the streams, whether large or small, which are created by the showers which come down from on high, and which when they become navigable can become the property of no individual or corporation, but belong solely to the public to be operated under its control, these streams when they are smaller are equally the property of the whole people. The power generated from them and the extent to which those who appropriate them can impound the waters and cover against the will of the owners the homes and homesteads of the people is a matter of overwhelming public importance. The power to stay the will of those who would cover the surface with impounded water and use the electricity generated from this source which comes from the skies should be absolutely controlled by statute and regulated by the representatives of the people. At present there must be asserted at least a strict limitation upon the extent to which the exercise of the power of eminent domain by these corporations over private property shall be

permitted, and there must be the strictest control which shall prevent any discrimination by them in rates and all excessive charges.   Besides, the decisions are uniform that no state can confer the right of eminent domain upon a corporation incorporated by another state.   20 Corpus Juris, 542; 10 R. C. L., 197, note 18; *Staton v. R. R.,* 144 N. C., 145; *R. R. v. Spencer,* 166 N. C., 522; *Brown v. Jackson,* 179 N. C., 365.

Beyond and above limitation by law as to all profits to individuals and to corporations, there must be the strict guardianship by the State outlined by statute, and in force by judicial and administrative officials, to protect for public use the bounty of heaven, whether folded in the recesses of the earth laid up from countless ages for the benefit of future generations of men, or created by the waters falling from the skies from which power is made for the necessities of men.

In this case, the inevitable and ultimate result of combination is not presented, nor the fact that small revenue is as yet derived by the State from this source, but we have before us the absolute necessity of restriction upon the gains that the owners of such property shall be permitted to receive, and of a denial of their right to discriminate which would inevitably bring all industrial plants and corporations into the control of some consolidated trust based upon the unified ownership of such motive power.

On the question of evidence, it would seem clear that in determining the reasonableness of the rate .to be fixed in this case by the jury they may consider the rates charged by this defendant to other like consumers in the State of South Carolina under the same or substantially similar conditions.   Such evidence is not controlling, but the jury have the right to consider it in passing upon the question whether the rates claimed by the plaintiff are reasonable.